IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DANNY HENDERSON,     *
  Plaintiff,       *
            *
   v.        *    Civil Case No. 3:07-CV-452-MEF
            *
LATHONIA WRIGHT, et. al.   *
            *
  Defendants.     *
            *

## MEMORANDUM BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff, Danny Henderson, and respectfully submits this Brief in Support of his Response to Defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment.

## STATEMENT OF DISPUTED FACTS

Plaintiff contends that most of the "undisputed facts" offered by the Defendants in their Brief in Support of the Motion to Dismiss are very much in dispute. In particular, Defendants repeatedly have been put on notice of Henderson's medical condition. Notice was first given during Henderson's initial consultation during booking after his arrival at the jail. While booking Henderson, officer Vernon Haynes questioned Henderson about his medical condition. Henderson told Haynes about his seizures and current medications. (Ex. A, Affidavit of Danny Henderson.) In addition, Henderson put Defendants on notice of his medical issues when he made verbal requests

1

for medical attention after his incarceration but before filing his pro se complaint. Henderson was never informed that he was put on a list for a physical and health screening but was told by other inmates that the previous Nurse Practitioner who occasionally performed medical exams had lost his license and was no longer able to assist the jail with inmate needs.

Defendants themselves admit violation of their own health screening policies by failing to provide Henderson with a proper screening. (See Def. Exhibit B, Declaration of Shirley Johnson 10.) Furthermore, Defendants' admit that it is their policy **NOT** to administer medication until an inmate has received a health-screening and physical from a doctor. (See Def. Exhibit B, Johnson Decl., 7.) Defendants arguments are contrary to their own policies in that it would be impossible for an inmate to receive prescribed medications, even medication prescribed before incarceration, until he has seen a doctor and it would be necessary for the inmate to wait for a health screening performed by a doctor. In Defendants' Declarations and Brief there is no mentioned that Henderson was placed on a list to receive a screening or physical from a "doctor" but rather that he was on a list to see a nurse practitioner. Nurse Practitioner Jim Gunnels makes no mention of Henderson previously being on a list to see him for health screening. (See Def. Ex. to Def. 06/05/07 Motion to Vacate, Declaration of Jim Gunnels, "Gunnels Decl.," 4.)

Henderson further disputes Gunnels assertion that Henderson failed to inform Wedowee E.R. staff of his epileptic condition. Henderson informed E.R. staff and jailers as to his condition and **also** complained of "sharp pains to the left side of his chest." Henderson's medical records from the date of his visit clearly note that he informed the nurse at triage that he had past history of seizures and arm paralysis. Henderson also complained of recent chest pains to his left side the two days prior to his visit and a headache for three to four days prior. (Ex. B, Wedowee Hospital Records.)

2

Gunnels may have simply chosen to disregard the triage assessment as part of his diagnosis and consultation with the client. Gunnels did however refer to the triage sheet in his Declaration thereby indicating he had reviewed the report.    (See Def. Ex. to Def. 06/05/07 Motion to Vacate, Jim Gunnels Decl., 4.)  One would think that a nurse practitioner would look into all past and current problems before attempting a final diagnosis of chest pain, persistent headache, and extremely high blood pressure without suggesting further treatment. Gunnels has made an error, either in his notations on the medical records from the hospital and/or in his declaration under oath submitted to this Court. Most importantly, the triage sheet notes that Henderson's medications at the time of triage were Elavil, which is an anti depressant and Carbamazine (brand name Tegretol), an anti-convulsant. Henderson was prescribed Metoprolol which is used to treat chest pain.  Why would a medical professional have a final diagnosis of chronic shoulder pain from a past injury yet prescribe medications for chest pain, hypertension and possible heart disease?  It is notable to mention that when Henderson was first seen at the E.R., his blood pressure was 204/103 (See Ex. B, Wedowee Hospital Records.) Clearly Henderson had either a past problem with hypertension or he was experiencing problems while at the jail, during his incarceration.  Even a layperson can appreciate that a blood pressure of 204/103 is extremely high and potentially dangerous.  Also, the radiology report notes a "**marked** elevation of the left hemidiaphragm" though no further notes nor the Declaration of Jim Gunnels indicate that any follow up was suggested to correct or investigate this "marked" elevation." Henderson was never notified of this elevation so that he could request further treatment and diagnosis (Ex. B, Wedowee Medical Records.)

3

Defendants themselves seem unclear as to their their own policies and procedures. In their brief, Defendants make note that it is their policy "to provide prompt medical attention to each and every inmate upon their request. A request may be submitted via a written request form or made verbally to a correction officer." (See Def. Brief at 3.) Defendants argue that Henderson never made request for medical care. Henderson did make several verbal requests for medical care, per the jail policy noted by Defendants, including a request at his initial booking performed by jailer Vernon Haynes. (Ex. A, Henderson Affidavit.) Additionally, other inmates have made numerous written and verbal request which jail Defendants have repeatedly failed to acknowledge, and in violation of their own policy, failed to provide "prompt medical attention to each and every inmate upon their request." (See Ex. A, Henderson Affidavit; Ex. F, Affidavit of Ben Anderson; Ex. G, Affidavit of Sandra Shelton; Ex. H, Affidavit of Larry Ward; Ex. I; Affidavit of Nosqualis Blake; and Ex. J; Affidavit of Linwood Johnson).

Defendants offer that they have a policy of allowing inmates to "submit grievances and that each grievance will be acted upon accordingly, " and that each grievance is placed in the inmates file for a record of the same." (Def. Brief at 4, See Def. Ex. B, Johnson Declaration 16.) According to Defendants, Henderson did not file a grievance. However, no such policy exists requiring a written grievance and Defendants have failed to produce such policy to Henderson or to this Court. Such a policy, had it been produced, would lend credible evidence to Defendants' argument yet that have chosen not to offer said policy. If an inmate can file a written or oral request for medical attention then a written or oral grievance request should carry the same weight. Henderson made several verbal grievances known to Johnson, Davidson and others. (Ex. A, Henderson Affidavit.) Clearly there are **contradicted and impeached facts** which create a genuine issue of material fact.

4

## ARGUMENT

Defendants bear the burden to prove they are entitled to have Henderson's claims dismissed by showing, "beyond a reasonable doubt the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (affirming district court's grant of 12(b)(6) dismissal). Summary judgment is only appropriate where "there is no genuine issue as to ANY material fact and. . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 ( c ). "In making this determination, we 'view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant.'" *Skop v. City of Atlanta*, 485 F.3d 1130, 1135 (11th Cir. 2007) quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1225 (11th Cir. 2004).

## I.  HENDERSON HAS COMPLIED WITH THE REQUIREMENTS OF THE PRISON LITIGATION REFORM ACT ("PLRA") AND HAS EXHAUSTED ALL AVAILABLE REMEDIES.

As Defendants point out, the first section of the PLRA requires that no action shall be brought until such administrative remedies **as are available** are exhausted. Henderson made verbal, requests for medical attention before filing his pro se complaint. (See Ex. A, Henderson Affidavit). According to the Defendants' own Declarations, the policy of the jail is that inmates can make verbal or written requests for medical attention. Henderson did not receive notice of a grievance policy until July 9, 2007, after being put on notice that such a policy existed after instituting ongoing action. On July 9, 2007, Henderson requested a grievance form and noted on the form that he wanted a copy of the "grievance appeal procedures, if any." The same day, Captain Craig Davidson returned a copy

of the request form with notations from Davidson and a copy of an untitled sheet of paper that included a paragraph titled "Grievance Procedure." (Ex. D, Henderson Request Form 07/09/07.) The so-called procedure offered to Henderson by Davidson is vague and does require any written grievance on the inmate's behalf. The procedure follows:

> "The Sheriff shall maintain a system whereby an inmate may request and make a grievance report which shall initiate investigations of alleged mistreatment or abuse of inmates by personnel or other inmates. Upon evidence of such mistreatment or abuse, the Sheriff shall discipline, through established procedures, the offending party. Written notice of the result of that investigation and of any action taken by the Sheriff shall be directed to the complaining inmate. That notice shall also be filed in the inmate's personal file and in the employee's file and shall be preserved, open and available for inspection by the Court. The Sheriff shall provide a written report of any mistreatment or abuse of an inmate upon request by any Judge of the Court." (See Ex. D, Grievance Procedure Submitted by Davidson 07/09/07).

Henderson has made numerous verbal "grievance reports" to jail officials. None of Henderson's reports appear to be investigated by the Sheriff as required by jail policy. At no time has the Sheriff disciplined the offending parties or acknowledged said reports with a written report of investigation or indicated what action was taken. The aforementioned procedure does not require **written grievances** and no other policies have been offered by Defendants during this litigation. The policy does however note the Sheriff's numerous responsibilities for addressing grievances. Fuller himself points out that he did not receive a grievance from Henderson thereby indicating he would receive grievances made by an inmate and would have knowledge of jail problems per the "grievance policy." (See Def. Ex. A, Declaration of Jeffrey Fuller at 7). However, both Johnson and Davidson fail to offer any indication that their policy requires Fuller investigate and report to the inmate his investigation of each grievance. Johnson and Davison merely note that it is the policy to "place each such grievance in the inmate's file for a record of the same." (See Def. Ex. B, Affidavit of Johnson at 16 and Def. Ex. C, Davidson Affidavit at 9.)

6

If another, more detailed procedure existed Defendants surely would have taken the opportunity to present the policy by now. In fact, Defendants have not offered a written policy to the Court at all but have simply cited in their Declarations a different policy than noted in written form and present to Henderson on July 9, 2007. No mention is made in Defendants' Declarations of the burden placed on the Sheriff to investigate and offer written finding of each grievance and his failure to comply.

It appears that jail staff are not aware or informed of a formal grievance procedure as evidenced when Henderson requested the grievance form on July 9, 2007. He was given one form that did not list "grievance" as an option but was simply entitled "Jail Inmate Request Form." The first form had a place for the Chief or Captain's signature. (Ex. C, First Blank Request Form.) The same form had been given to Henderson when he asked to have access to money in his inmate account. Defendants' note Henderson's request for said monies and use this to argue he was informed of jail grievance policies. The form simply requires an inmate to state his request but does not offer information about a grievance procedure. A similar, general "inmate request" form is used for medical requests. If such general forms are used, without explanation of what is required by the inmate, how can an inmate be deemed to be put on notice of the jail's grievance policy. Similarly, if an inmate had made numerous written medical requests that had gone unanswered why would that inmate have reason to believe there was a grievance policy whereby he could request relief if he had never been put on notice of the same. The second "grievance form" provided was submitted by Henderson on July 9, 2007. This form specifically offers options to the inmate for medical, grievance or special visit requests. There are boxes by which jail staff can reply to the request and provide copies to various entities (none of which are the Sheriff).

7

Prior to filing his pro se Complaint, Henderson was not provided an inmate handbook, offered a copy of grievance procedures including any appeal procedures nor was he verbally informed that the jail had a grievance policy. Defendants argue that the Court should take judicial notice that Plaintiff was aware of the jail grievance policy due to his request that a jail official complete a certificate of standing so he could access money in his jail account to file his complaint. Defendants did not offer Henderson's request as an exhibit in their brief so it is unknown to the Court and Henderson what form was used to request the certificate of standing. So many forms are presented to inmates without explanation. A general "request form" is not the same as a "grievance form" as evidenced by the various forms presented to Henderson and those offered by the Defendants in their pleadings.

If Defendants have in place a grievance policy for the jail, then jail staff are unclear as to what procedure to follow and therefore, it would be unjust to require inmates to follow the procedure. Whether the policy is verbal or written, what forms, if any, are required, who should receive copies, who is responsible for handling grievances and essentially, what the definition of a grievance, according to their own policy, really is. Henderson does not argue his own ignorance of the jail's grievance policy but rather jail official's own ignorance of the grievance policy they are required to institute. Henderson does not argue "constructive exhaustion" of the jail's grievance policy but based on the policy offered by Davidson, argues he has exhausted all available remedies once he put the jail on notice of his grievances. The burden then shifted to jail officials and the Sheriff to comply with their own requirements. The Defendants' clearly failed to follow their own procedure and therefore should not be entitled to have the claims against them dismissed.

8

If jail staff are unable to determine which form is to be used for what purpose then there is no clear policy for an inmate to follow. The jail's policy provided by Davidson does not require a **WRITTEN** grievance be filed and similarly, as noted by Defendants' Declaration, a medical request can be both written or verbal therefore Henderson exhausted all remedies available to him prior to filing his pro se Complaint.

## II.  ALL CLAIMS BROUGHT AGAINST FULLER AND JOHNSON IN THEIR OFFICIAL CAPACITY ARE BROUGHT ONLY FOR PROSPECTIVE INJUNCTIVE RELIEF.

It is well settled that a prisoner can bring an action against state officials in their official capacity when requesting prospective injunctive relief. *Stevens v. Gay*, 863 F.2d 113, 115 (11th Cir. 1989). Henderson has requested injunctive relief and therefore can sue Johnson and Fuller in their official capacities for such relief.

## III.  FULLER AND JOHNSON ARE PRECLUDED FROM CLAIMING QUALIFIED IMMUNITY FROM HENDERSON'S CLAIMS.

In *Skop v. City of Atlanta*, 485 F.3d 1130 (2007), the Eleventh Circuit cited the proper method for analysis a defense of qualified immunity.

> "An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within his discretionary authority. If the official was citing within the scope of his discretionary authority... the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. Overcoming the official's qualified immunity defense involves two steps. First, the plaintiff must establish that the defendant's conduct violated a statutory or constitutional right. Next, the plaintiff must show that the violation was "clearly established." *Id.* at 1135 quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Henderson has met the heightened pleading requirement involving §1983 cases by describing in exhaustive detail each and every allegation against the Defendants. Fuller and Johnson are not

9

entitled to qualified immunity as they have failed to establish they were acting with discretionary authority. Furthermore, Henderson has shown his protected rights were violated and Defendants knew that said violation was "clearly established."

A.    **Henderson has met the Eleventh Circuit's Heightened Pleading requirement.**

Henderson's Amended Complaint alleges all relevant facts and claims against the Defendants with a great deal of specificity. The Defendants admit that the Amended Complaint offers enough facts and evidence to conclude they were "acting within their discretionary authority." (See Def. Brief at 16.) By admitting to this, Defendants have circumvented their own argument as their burden is to prove they acted in their discretionary authority. If Henderson's Amended Complaint is sufficient enough for the Defendants to make the claim of discretionary authority then Henderson has met his "heightened pleading" requirement. Additionally, a specific time line of events relating to Henderson's medical claims is provided, inhumane conditions and treatment are described with specific and exhaustive detail and Henderson's First Amendment claim is sufficient to put Defendants on notice of the violation. Henderson's amended complaint offers more than sufficient detail to enable this Court to determine the facts overcome the defense of qualified immunity. Morever, Defendants' argument fails to point out all that is deficient with Henderson's Amended Complaint but rather the Brief in Support of Defendants' Motion to Dismiss cites exhaustive caselaw and is deficient in notation of relevant facts.

B.    **Fuller and Johnson have failed to prove they were acting with discretionary authority when they violated Henderson's rights.**

"The burden is first on the defendant to establish that the allegedly unconstitutional conduct

10

occurred while he was acting within the scope of his discretionary authority. ...if, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). "To act within the scope of discretionary authority means that the actions were (1) undertaken pursuant to the performance of [the official's] duties and (2) within the scope of [his] authority." *Collier v. Dickinson*, 477 F.3d 1306, 1307 n.1 (11th Cir. 2007). Fuller and Johnson must show that they were "performing a legitimate job-related function through means in his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1255 (11th Cir. 2004).

Here, neither Fuller nor Johnson have offered more than vague assertions that they were acting within their discretionary authority and that "because all actions complained of in the Complaint are law enforcement activities, and law enforcement activities are 'a legitimate job-related function' of a Sheriff and Deputy Sheriff." (See Def. Brief at 16). "A bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice. There must be a showing by competent summary judgment materials of objective circumstances that would compel the conclusion" that defendant acted within his discretionary authority. *Harbert International* at 1282, quoting *Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 830 (11th Cir. 1982). Defendants offer only their job title and nothing more to meet their burden for proving they acting in their discretionary authority. Defendants' motion is due to be denied on this ground alone.

C.    **Fuller and Johnson's conduct violated Henderson's constitutionally protected rights.**

Should this Court find that Defendants' have met their burden, their motion is still due to be denied as Henderson has alleged and offered evidence that Defendants' violated his statutory and

11

constitutional rights. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730 (2002) quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### I.  Medical Care

"A serious medical need is one that is so obvious that even a layperson would easily recognize the necessity for doctor's attention." *Farrow v. West*, 320 F.3d 1344-51 (11th Cir. 2004.) Fuller and Johnson were deliberately indifferent to Henderson's serious medical condition. Henderson put the Defendants and their staff on notice of his medical condition and need for medication upon his initial arrival at the jail and numerous times after his incarceration even before the filing of his Complaint. Even though verbal medical requests were made by Henderson to Haynes, Davidson, Johnson and others, those requests were ignored. Defendants have shown deliberate indifference to the serious medical condition of Henderson and many, many other inmates.

Henderson has shown he has a serious medical condition and will be in a position to provide further evidence when given leave to submit discovery. Henderson informed the Defendants and their officers about his seizure history and his current medications. Henderson requested his medication. Henderson informed the Defendants and their staff numerous times that he needed medical attention. Henderson informed the Wedowee E.R. triage nurse AND Gunnels about his condition as noted on the triage intake form. Henderson was admitted to the Wedowee E.R. with a blood pressure of 204/108. The E.R. staff was informed of his medications including anti-convulsants. Henderson complained of serious headaches and sharp pains in the left side of his chest. Gunnels prescribed medication for heart problems and high blood pressure. The E.R. records show Henderson had a "marked elevation" of his left hemiodiaphragm. (Ex. B, Wedowee Medical

12

Records.) Henderson had a seizure episode while in the shower, blacked out and hit his head. He was placed in isolation while his head healed. Henderson has clearly established that he complained of a serious medical condition, was treated for a serious medical condition (even though he had a seizure disorder that was not treated), and clearly has a serious medical condition. Even a layperson could recognize the need for Henderson to receive medical attention.

Henderson also makes allegations of inadequate medical care. Gunnels helped to establish deficient care when declaring he was not put on notice of Henderson's seizure history or prescribed anti-convulsant medication. One would have reason to expect that the medical professional they are consulting with at the E.R. would at least acknowledge the dangers of such a past history and the concerns that the patient had not been receiving proper medication. Defendants argue that they do not have medical training, education or experience and should not be held liable for emergency medical procedures but rely on medical professionals to make such determinations. In addition, if Defendants argue they have no medical training to assist them with emergency situations, then they are in no position to decide what medical requests to ignore and what requests are emergencies and what can be handled by a nurse practitioner who is scheduled to visit the jail monthly, if they come at all. If Defendants are not in a position to make medical decisions, they should be expected to ensure the medical professionals they are hiring are qualified to make said decisions. Perhaps the discovery process will shed light on other issues regarding the licensing and scope of training of those medical professionals hired to provide medical treatment to inmates.

### ii.    Inhumane Conditions

"...While the Constitution does not require prisons to be comfortable, it also does not permit them to be **inhumane** and it is now well settled that the . . . conditions under [a prisoner] is confined

13

are subject to scrutiny under the Eighth Amendment." *Jordan v. Doe*, 38 F.3d 1559, 1564 (11th Cir. 1994). To show a violation of Eighth Amendment rights, an inmate must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995). In their brief, Defendants' offer the following caselaw to assist in our analysis. "The Constitution does not require that prisoners be provided any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration." *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir. 1977), rev'd in part on other grounds, 438 U.S. 781 (1978). Only where the conditions complained of resulted in "unquestioned and serious deprivation of basic human needs" do they rise to a constitutional violation. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

Defendants' argue that Henderson's allegations of safety hazards including exposed wiring and problems with smoke alarms, fire alarms, and sprinklers. To Defendants, it is not enough that violent inmates are not segregated or that pretrial detainees are in the same cell as convicted felons or that inmates are not allowed adequate exercise and are denied access to courts and legal materials. According to Defendants, it is not enough that the conditions at the jail are unsanitary, that showers and toilets do not work, there is no clean running water to drink, plastic utensils are used repeatedly without being washed, and food is handled improperly and nutritionally inadequate. Defendants do not think it is a serious deprivation of basic human needs that inmates with communicable disease are untreated and allowed to interact with other inmates or that inmates sleep on the floor in frigid temperature under toilets and steel bunks not properly bolted to walls. The Plaintiff would ask then, what is enough to rise to Defendants' level of "unquestioned and serious deprivation of basic human needs?" Defendants maintain that Henderson and other inmates are not subjected to inhumane

14

conditions but rather entitled to "live as comfortably as possible." (See Def. Brief 24-26)

**Henderson has adequately alleged that Defendants violations produce a substantial risk of serious harm.**

In *Marsh v. Butler Co., Ala.*, 268 F.3d 1014 (11th Cir. 2001), inmates complained of circumstances almost identical to those complained of and alleged by Henderson. Among those complaints were; improper medical screening, jail overcrowding, no segregation of pretrial detainees and violent offenders, no supervision of inmates to maintain safety; and the jail not operating according to its written policies. The Court found that, these alleged conditions, if true, present an objectively substantial risk of serious harm..." *Id.* at 1018.

Moreover, "As the Supreme Court had written (before the Plaintiffs were injured in this case), an Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet occurred. *Marsh v. Butler Co. Ala.*, at 1018 quoting *Gates v. Collier*, 501 F.2d 1291, 1300-01 (5th Cir. 1974). Henderson's right have been violated due to exposed electrical wiring, unsanitary food handling, overcrowded cells, lack of exercise, improperly functioning toilets and showers, lack of inmate segregation, improper fire alarms and sprinklers, inadequate diet, and mingling of inmates with communicable disease, these conditions constitute an Eighth Amendment violation.

**Henderson has adequately alleged that the Defendants have shown deliberate indifference to the risks and failed to respond in a reasonable way to the risks.**

Fuller and Johnson have known about the alleged inhumane treatment and conditions of Randolph County Jail long before Henderson filed his pro se Complaint. Prior to the filing of Henderson's Complaint, there had been a series of news articles in Randolph County papers scrutinizing jail conditions and those in charge of maintaining the jail. Commissioners are quoted

acknowledging the horrid conditions, Davidson is quoted acknowledging dilapidated jail conditions, Commissioner Wright took newspaper reporters on a tour of the jail, and other staff readily shared the problems with reporters. Henderson put Defendants on notice of conditions when he verbally made note of his complaints with lack of access to legal material, requested medical care, complained to staff about listening to the "ten commandments," and especially when he sat in the jail office with Davidson and Johnson to request money for filing his complaint. During that conversation, Johnson told Henderson not to complain to her but to tell a federal judge and make sure to sue the county commission because the conditions were their fault. (Ex. A, Henderson Affidavit). The conditions at Randolph County Jail are longstanding, Defendants were aware of the risk, sufficiently put on notice and have acted unreasonably by actively disregarding the problem while inmates have suffered and essentially have chosen to do **absolutely nothing**.

**Henderson has adequately alleged that the violation of Defendants caused his injuries.**

Henderson has suffered medical injuries as a result of the Defendants' violations and their ongoing indifference to his condition. Henderson had a seizure, high blood pressure, chest pain, a seizure that caused him to hit his head and be isolated, and possible long-term disabilities due to his untreated medical conditions and exposure to inhumane conditions at the jail.

Moreover, "As the Supreme Court had written (before the Plaintiffs were injured in this case), an Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet occurred. *Marsh v. Butler Co. Ala.*, at 1018 quoting *Gates v. Collier*, 501 F.2d 1291, 1300-01 (5th Cir. 1974). Henderson's right have been violated due to exposed electrical wiring, unsanitary food handling, overcrowded cells, lack of exercise, improperly functioning toilets and showers, lack of inmate segregation, improper fire alarms and sprinklers,

16

inadequate diet, and mingling of inmates with communicable disease, these conditions constitute an Eighth Amendment violation.

There is an affirmative connection between Defendants actions and the violation of Henderson's right. In their Brief, Defendants' reference *Zatler v. Wainwright*, 802 F.2d 397 (11th Cir. 1986), "The requisite causal connection may be shown by the personal participation of Defendants, a policy established by Defendants resulting in indifference to constitutional rights, or a breach of a duty imposed state of local law which results in constitutional injury. (See Def. Brief at 36). Further quoting *Brown v. Crawford*, 906 F.2d 667,671 (11th Cir. 1990) (citations omitted):

> "Supervisory liability [under §1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a **history of widespread abuse** puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be '**obvious, flagrant, rampant and of continued duration**, rather than isolated occurrences.'"

*Id.* At 671. (See Def. Brief at 36).

Defendants' actions, or inaction have a clear causal connection to the constitutional violations of Henderson's rights. There is a history of widespread abuse that is obvious and rampant at the Randolph County Jail. The abuse is longstanding and of a continued duration. Defendants are responsible and liable.

In the attached *The Peoples Voice* newspaper dated **April 13, 2007**, county commissioner Lathonia Wright hosted a tour of the jail for newspaper staff. It is noted in the article that, "personnel gladly pointed out the hazards and structural problems in the jail facility." Further, "leaks were seen in the kitchen. The leaks appeared to be coming from the toilets and bathroom in the jail

17

cells, which are located directly above the kitchen." "There is not a single shower in the building that does not look like it's infected with some kind of deadly disease." "It was a stomach-turning experience. It is unhealthy, hazardous and inhumane." (Ex. L, *The People's Voice* 04/13/07).

*The Randolph Leader,* on **May 31, 2007,** was given a tour of the facility by Davidson and county commissioner Kevin Spears. "In a recent tour....they pointed out that the jail was outdated when it was completed in 1985." "At one time water from the floor above was running down the stove hood and into the food, although Davidson said it was clean water, not from showers." Fuller was quoted, "We've always been over capacity and we have had 110 when there are only 36 bunks or beds...I've been wanting a new jail for 13 years." Of great concern is dangerous exposure to disease, ....since potentially **deadly** staph infections have occurred in the population, resulting in some hospitalizations." (Ex. N, *The Randolph Leader*, 05/31/07).

As if more evidence is needed of the inhumane conditions, "Davidson points out the mold on the walls where inmates valuables are held." "To prevent escape, windows are covered with metal  that blocks outside views and light." **"In a good week** inmates are taken once to a fenced yard outside the kitchen." "Because we don't have adequate space we have someone not paying child support sleeping next to a murderer, Davidson said." (Ex. N, *The Randolph Leader*, 05/31/07).

On **June 29, 2007,** a letter from an inmate at Randolph County Jail was published in *The People's Voice*. The inmate, Jeffrey Fanning, wrote about unspeakable conditions and begged for help.  "There are feces and urine in the broken toilets that have been standing in the bowls for months. The inmates are instructed to pour bleach on them and to wrap the feces filled toilets with trash bags to muffle the smell. We are denied law books because they say it is a fire hazard to have law books in the cell blocks. The sprinkler systems have broken heads throughout the cell blocks

18

and raw electrical wires hanging out of the walls and ceiling." "They have put an inmate in our block they think has T.B. They made him wear a blue doctor's mask over his face when he was downstairs with them but when they moved him upstairs with us. He just keeps his mouth covered. He coughs all the time with his mouth buried in his blanket..." "Inmates are denied medical care." "There are roaches frozen in our ice cubes that we use for drinking water...We are exposed to mold on a daily basis." (Ex. O, The People's Voice 06/29/07).

Defendants are liable in their supervisory capacity. Fuller, Johnson and others have implemented a policy of indifference while these unspeakable, inhumane conditions have continued. The abuse is widespread and is **obvious, flagrant, rampant and of continued duration**. By their own admission to local reporters, they knew of the abuse, it began years ago and the Defendants choose to do nothing to correct the problem so that the inmates under their care could maintain even a minute level of their humanity.

### Henderson's First Amendment Rights were violated by Defendants.

Henderson's First Amendment Rights were violated by the Defendants when they compelled him to attend Christian religious services and repeatedly informed him that he was not allowed any reading materials other than Christian religious texts. Henderson has a right to exercise his religious beliefs and the jail's policy of allowing Christian religious preaching and teachings which inmates are compelled to attend is in violation of those rights. Although Defendants, through their Declarations indicate that Randolph County Jail has a policy that prohibits discrimination against any inmate for his religious preference they are clearly promoting the Christian religion and compelling inmates to attend.

Further, Defendants claim that inmates are not required to attend the meetings but once they

19

choose to attend cannot leave until it concludes for security reasons. These assertions are untrue. Even if jail staff do not physically put inmates in a separate room with a religious teacher or preacher, the act of placing a religious teacher or preacher in the cell with inmates who cannot leave is in essence compelling those inmates to attend the meeting. Randolph County Jail has no recreation room or other area in which inmates could be placed outside their cells for a religious meeting. This requires the religious meetings to be within the cell block where inmates cannot leave nor can they actively segregate themselves from the meeting. Anywhere inmates move within the block they will be able to hear the religious meeting. (Ex. A ,Henderson Affidavit). Defendants note in their Brief that, "To the extent that the jail policy impinges Plaintiff's constitutional rights, it is reasonably related to legitimate penalogical interest and is valid." (See Def. Brief at 31.) There is no valid penalogical interest in having religious meeting in cell blocks and Henderson's rights were and continue to be violated by this practice.

**D.      The violations committed by Fuller and Johnson were "clearly established".**

It was clearly established in April 2007, that Defendants indifference to Henderson's medical condition, need for medication and the inhumane conditions at the Randolph County Jail violate the Eighth Amendment to the Constitution and being compelled to attend religious meetings violates his First Amendment rights. "In U.S. v. Lanier, 520 U.S. 259 (1997), we held that the defendant was entitled to "fair warning" that his conduct deprived his victim of a constitutional right was "clearly established" in civil litigation under Sec. 1983." *Hope v. Pelzner*, 536 U.S. 730, 737 (2002) quoting *U.S. v. Lanier* at 26.

20

### I.    Medical Care

The Supreme Court, in *Estelle v. Gamble*, 97 S.Ct. 285 (1976) established an inmate's right to medical care.  Essentially *Estelle* held that, when presented with an inmate who has a serious medical condition their was an obligation to provide medical care due to the fact that "an inmate must rely on prison authorities to treat his medical needs; if authorities fail to do so, those needs will not be met." *Id.* At 290.    This duty has been restated repeatedly in caselaw.  See generally, *DeShaney v. Winnebago County Dept. Of Social Services*, 109 S.Ct. 998 (1989), *West v. Atkins*, 108 S.Ct. 2250 (1988); *Rhodes v. Chapman*, 101 S.Ct. 2392 (1981).  As early as 1976 caselaw has "clearly established" that there is an obligation to treat an inmate who is incarcerated and has a serious medical condition.  Here, Defendants were deliberately indifferent to Henderson's medical needs for the first month of his incarceration and continue their policy of indifference today.

### ii.    Inhumane Conditions

Clearly established law put the Defendants on notice that the inhumane conditions alleged by Henderson violate constitutionally protected rights.  Henderson has repeatedly informed Defendants and has sufficiently alleged inhumane treatment and conditions at the Randolph County jail including, but not limited to, overcrowded cells, exposure to unsanitary meals and an inadequate diet, risk of harm from exposed electrical wires, fire alarms and sprinkler, lack of proper exercise, lack of supervision by jail staff, no segregation of pretrial detainees and violent offenders, no access to the courts and legal materials, improperly functioning toilets, showers and limited drinking water.

In *Marsh v. Butler Co., Ala.*, 268 F.3d 1014 (2001) inmates complained of circumstances almost identical to those complained of and alleged by Henderson.  Among those complaints were; improper medical screening, jail overcrowding, no segregation of pretrial detainees and violent

21

offenders, no supervision of inmates to maintain safety; and the jail not operating according to its written policies. The Court found that, these alleged conditions, if true, present an objectively substantial risk of serious harm..." *Id.* at 1018. Henderson complains of jail overcrowding, no segregation of pretrial detainees and violent offenders, no supervision of inmates and the jail not operating in accordance with its own policies. As evidenced by the numerous attached inmate affidavits citing the stabbing incident where Ben Anderson was attacked and not assisted for approximately fifteen minutes, there is definitely an issue with inmate safety at the Randolph County jail. This situation could be brought on by other conditions including failure to segregate and supervise inmates. The attached newspaper articles from local papers quote jail officials as being concerned with the past riots. A riot could easily cause a great deal of harm and injury to inmates and jail staff. Caselaw dictates "that inmates be furnished with basic human needs, one of which is reasonable safety." *Helling v. McKinney*, 113 S.Ct. 2475, 2480-81 (1993). Defendants had "fair warning" of clearly established law that improper medical screening, failure to segregate inmates, failure to properly supervise inmates, and jail overcrowding violated Henderson's Eighth Amendment rights.

Furthermore, "exposed electrical wiring, deficient firefighting measures and mingling of inmates with contagious disease constituted Eighth Amendment violation even though no showing was made that prisoners had been injured or had contracted disease due to these conditions." *Marsh* quoting *Gates v. Collier*, 501 F.2d 1291, 1300-01 (5th Cir. 1975). Defendants had "fair warning" of clearly established law that exposed electrical wires, deficient firefighting measures and mingling of inmates with disease violated Henderson's Eighth Amendment rights.

"The fundamental constitutional right of access to the court requires prison authorities

22

to...provide prisoners with adequate law libraries where adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 US 817, 828 (1977). The Supreme Court, however, has clarified that prisoner's contentions of depravation of access to Courts must show actual injury as a "constitutional prerequisite." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Defendants claim Henderson has not been prejudiced by his inability to access law library. First, it is important to note that the Randolph County Jail has no law library and as a policy forbids access to legal materials. (Ex. A, Henderson Affidavit). Henderson was actually harmed by failure to have access to a law library even though he managed to file a pro se complaint and was appointed an attorney shortly after. Henderson may have been harmed by lack of access to legal materials, If granted access to legal materials or a law library, he would have been put on notice that the jail was required to maintain a grievance policy and therefore he could have requested formal grievance procedures from jail staff. This harm could be detrimental to Henderson's claim. Therefore he has been directly harmed and his rights violated.

In the case of *Wilson v. Blankenship*, 163 F. 3 D 1284 (11th Cir. 1998) was held that, "the proper inquiry for a pretrial detainee is confinement conditions amount to punishment of the unadjudicated detainee.). *Id.* at 1290 quoting *Bell v. Wolfish*, 441 U.S. 520, 535. Randolph County Jail has space for outdoor exercise albeit a very limited space. It is noted by Henderson that he has sporadically been allowed outdoor exercise. However, it is a natural deduction that Henderson's lack of consistent exercises is directly related to a punishment for filing his complaint. The jail policy does allow for outdoor exercise but the Defendants have failed to maintain consistent exercise and therefore appear to be punishing the inmates by failing to provide regular outdoor exercise. Defendants were put on notice by clearly established law of Henderson's right to access law library and his right to reasonable exercise.

23

### iii.    First Amendment Violation

An inmate does not give up all of his rights when incarcerated. "Convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Inmates clearly retain protections afforded by the First Amendment, *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Henderson continues to be protected by the First Amendment and should not be compelled by Defendants to attend prayer services or any other religious services. Davidson, per in his Declaration, has coordinated with other religious organizations to attempt to have meetings at the jail. Regardless of any attempts by Defendants to request that other religions hold meetings in jail, this is not the issue at hand. Rather, the issue remains that Henderson's rights were violated when he was compelled to attend a religious service, regardless of that religious service, in violation of his religious belief. Clearly established law puts Defendants on notice of Henderson's First Amendment rights.

## IV.    HENDERSON IS ENTITLED TO INJUNCTIVE RELIEF.

According to Defendants, "Before a plaintiff is entitled to permanent injunctive relief from a constitutional violation, the plaintiff must first establish that such a violation occurred. See *Newman v. State of Ala.*, 683 F.2d 1312, 1319 (11th Cir. 1982). . . Then, he must show: (1) irreparable injury if the injunction does not issue and (2) lack of an adequate remedy at law. *Newman*, 683 F.2d at 1319 citing *Beacon Theatres, Inc. V. Westover*, 359 U.S. 500, 506 (1959)." See Def. Brief at 41.

Here, Henderson has established a violation of constitutional rights. If an injunction is not issued Henderson WILL suffer irreparable injury either from his medical condition, his religious

rights or from the serious risk of harm from inhumane jail conditions. There are no adequate remedies at law that Henderson could pursue other than the remedies he is currently seeking. An injunction is necessary in this cause to prevent further harm to Henderson. Henderson faces a very realistic threat from the application of Defendants' policies.

## V.    CONCLUSION

Based on the foregoing Danny Henderson respectfully request that this Honorable Court deny the Defendant's motion to dismiss or in the alternative motion for summary judgment. Henderson encourages this Court to visit the Randolph County Jail and witness firsthand treatment of inmates and the violations that occur each day.

**RESPECTFULLY SUBMITTED on this the 13th Day of July, 2007.**

> **s/ KESA M. JOHNSTON**
> Kesa M. Johnston
> Attorney for Plaintiff
> Oliver Kitchens, P.C.
> Post Office Box 486
> Roanoke, Alabama 36274
> 334.863.2181 phone
> 334.863.4313 fax
> kesa@oliverkitchens.com
> Alabama State Bar (JOH185)
>
> **s/JAY LEWIS**
> Jay Lewis
> Attorney for Plaintiff
> Law Offices of Jay Lewis, LLC
> P.O. Box 5059
> Montgomery, Alabama 36103
> (334) 263-7733 (Voice)
> (334) 832-4390 (Fax)
> J-lewis@JayLewisLaw.com
> ASB-2014-E66J

## CERTIFICATE OF SERVICE

I hereby certify that on this the 13th day of July, 2007, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and that notice will be sent to the following CM/ECF participants:   **Kendrick E. Webb, Esq., Joe Hubbard, Jr. and Richard Hill, Jr. Esq.**

**s/Kesa M. Johnston**
**s/ Jay Lewis**

# EXHIBIT A

# AFFIDAVIT OF DANNY HENDERSON

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

<u>**AFFIDAVIT**</u>

"My name Danny Henderson and I am currently incarcerated in the Randolph County Jail in Wedowee, Alabama. My incarceration began on approximately April 13, 2007. I am a pretrial detainee awaiting a trial for the charge of murder by vehicle in 2004. I was indicted in September 2006 and was brought to Alabama from Georgia on or about April 13, 2007. I draw SSI for physical disabilities including a seizure condition that requires me to take Carbamazepine (also known as Tegretol) an anti-seizure medication and Elavil for depression. I was shot in the arm in 1992 and have suffered many repercussions from that incident.

From the time that I was booked until May 23, 2007, I had made requests to see a doctor and had not been given access to medical care until Judge Fuller issued a temporary restraining order. At that time I was transported to the Wedowee Hospital by a jailer and was finally able to see a doctor in the ER. I have been denied my seizure medicines and my depression medicine by jail staff. During the time I was at the emergency room I was treated for high blood pressure and chest pain and explained my condition to a person I thought was a doctor. I also told the nurse who signed me in about my condition and my last prescriptions. I am not sure at this time if I saw a doctor or a nurse practitioner at the emergency room. After being released from the hospital I was taken back to the jail and several days later the same doctor or nurse practitioner I saw at the emergency room came to the jail for a consultation. Since that time the doctor (what I now know is a nurse practitioner) has visited the jail but was not doing so on a regular basis when I was first incarcerated. During my consult at the jail I saw the practitioner in the jail office where approximately 3 to 5 jailers were present during the consultation. A nurse took my blood pressure and I met with the practitioner approximately 10 minutes during which time he never took my medical history or requested any such information. The nurse practitioner said to me that "We already ruled out seizures." The practitioner commented on my blood pressure being extremely high and added another pill to my regimen. I had been prescribed meds after leaving the ER but was never told what the medications were or the frequency in which I was to take them until after the nurse practitioner made his first trip to the jail. During his visit, I noticed that he had no notes from my visit to the ER and therefore was not referring to my previous records. I have never been told how long I was to be on my medications or what drugs I was taking. I told the practitioner I continued to feel like my foot was asleep and I was concerned about not taking the medication I had previously been taking for approximately 15 years. During my visit with the nurse practitioner he was discussing another inmate's issues with the jailers including her reason for incarceration and facts about her medical and drug problems. I felt this was extremely unprofessional and was concerned about sharing any of my personal information with the nurse practitioner considering his readiness to discuss the same with the same jailers who put me in such a bad position and whom I had filed suit against.

After my E.R. visit, I had a "black out" in the shower and hit my head which caused bleeding and a scab formed. Craig Davidson put me "in the hole" due to the scab. Mr. Davidson knew I hit my head and the reason why, but he did not seek any medical care on my behalf. At that time Davidson also took pictures of my head which should also be including in my file. I feel that I would have never received any medical care for my condition but for Judge Fuller issuing a temporary restraining order so that I was able to receive help. The jail officials, as well as the nurse practitioner, are incorrect when they note in their affidavits that I never explained to them what condition I had. I not only told the jailers but also attempted to discuss such issues with the nurse practitioner. I relayed to nurse practitioner my condition, not only at the hospital but at the jail, and took it that his medical background would be sufficient so he would know what to look for in terms of my treatment and ongoing medical health. I was prescribed Hydrochlorothia which I assumed helps prevent strokes or a heart attack. I have also been prescribed Metoprolol, which my lawyer has informed me appears to assist with chest pain and heart disease. I was also prescribed Sulfamef and Naproxen.

I had requested medical treatment prior to filing my 1983 action and I knew this was supposedly the procedure when I was told that it would cost me $3.00 each time I requested to see the doctor and that said money would be taken from my commissary account. I first informed the jail of my condition and medications when questioned by jailer Vernon Haynes during booking. Haynes used a form and to my knowledge he should have filled in the information about my seizures and medication. In addition, I had made verbal medical requests to various jailers, including Davidson and Johnson. I told Johnson about all my concerns with the jail the day I asked for money to file my complaint. She told me to make sure I sued the county commission because everything was their fault. She made no effort to consult with me about my grievance nor offer any help with my condition. I had told other jailers including Davidson about my grievances with jail conditions, I was told to shut up or I would be punished. I have never received an inmate handbook but was made to sign paperwork indicating I had received the handbook during booking. I was also made to sign a paper that said the jailers can read all my mail. I signed these papers simply because I had no other choice as I was incarcerated, and being booked without being given the option not to sign the paperwork. The only information I have ever seen about any kind of jail policy or procedure are a few sheets of paper taped to the window on our block that essentially translate as inmates we have the right to see a physician as soon as possible if we have an emergency condition or that we can arrange for a private doctor at our expense to treat us for any problems. Other than this information there is nothing more than basic rules about not fighting or having any conflicts with other inmates or jailers. There is absolutely **no information** regarding any grievance policy or our rights as inmates or an inmate handbook explaining the rules or any appeal procedure for any grievances we may have. Essentially, we have to verbally request that jailers assist us with our needs. I have seen many other inmates fill out numerous medical request forms and other forms and they have never been allowed to see a medical professional.

On July 9, 2007, I requested a grievance form after my lawyer informed me in mid June 2007, the jail supposedly had a policy that would assist me with getting the relief I have already requested. I was given one form that was titled "Inmate Request Form" but was a basic form that offered no area to file a grievance but only a "request." I was then given another form titled, "Inmate Request Form" that offered the option of requesting medical, grievance, or special visit needs. I filled out

the form requesting the grievance appeal procedure. The same day Craig Davidson returned my form with notations that he had complied with my requests. He also handed me a random sheet of paper with no title but a paragraph labeled "Grievance Procedure." I am very unclear about the procedure. Obviously it is the appeal procedure as that is what I had requested. However, I am not sure Davidson himself knew what to give me."

As noted in my original pro se complaint, the Randolph County Jail experiences extreme jail overcrowding, there is poor lighting in all the cells. It is necessary to twist wires on the light overhead to turn it on and off. Many inmates do this on a daily basis. None of the sinks work, we must drink our water from filthy showers, inmates use the raw electrical wires to boil water for their drinking and washing needs, prisoners are left unattended and rarely checked on by jail officials and several altercations have taken place, there is very little recreation for inmates and occasionally we are given 30 minutes outside during which time we are shackled. I was told by Shirley Johnson directly that I should never complain about the conditions or I would be punished and she specifically noted that I should "Sue the county commissioners if you want us to stop violating your constitutional rights." This was the same day I was brought to the jail office to sign for money to file the 1983 complaint. In addition, Lathonia Wright, one of the Randolph County Commissioners, has been quoted in the newspapers as saying that a federal judge has required a new jail be built in the past and that if inmates wanted relief a federal judge would have to order it to be done again. Inmates are denied access to the courts even though myself and others repeatedly filled out lawyer request forms, we are denied law books and I specifically asked Sargent Sharon Satterwhite on May 9, 2007, for legal books and she stated, "only Bibles were allowed at the jail." On April 30, 2007, I asked Vernon Hayes for legal books and he again noted and only "Holy Bibles are allowed." On May 18, 2007, I requested that Craig Davidson give me access to legal books so that I could write my pro se complaint in the 1983 action and Davidson said, "Only Bibles are allowed in our jail". I am repeatedly forced to hear the Ten Commandments preached each Thursday night in violation of my First Amendment rights. While I am not shackled in front of the Bible study preacher I have no place to go in that all Bible study classes take place in our block and there is no way to segregate myself from hearing such preaching. I am not given a proper diet and am forced to use the same plastic eating spoon meal after meal without it being washed properly. I am forced to sleep on the concrete floor even though I have a paralyzed arm and I am in chronic pain. My back often gets so cold that it is impossible to sleep and I experience excessive headaches.

There is an average of 15 to 20 men in my block and most have to sleep on the floor, some under the toilet itself. In order to keep our area clean we have often used an empty drink bottle to get dirty mop water to try and clean our area and keep it safe from disease. I have witnessed a man who tried to hang himself in the jail where it took jailers at least 10 minutes to respond to the inmates cries for help to assist the man. The man, "Larry" told jailers about needing his medicine for approximately one month prior to the suicide attempt and after he tried to hang himself he was actually brought out of his cell. It is my understanding another inmate had hung himself in November 2006. There is another inmate incarcerated on another block named Mario Broom. Broom has had several seizures since his incarceration and on at least one occasion the jailers have had a trustee watch him after one of his seizures. It is my knowledge Broom has yet to see a medical professional even though he has had several seizure events.

This information is true and correct to the best of my knowledge."

Dated this _____ day of _____, 2007.

_____
Danny Henderson

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

Danny Henderson, being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of his knowledge and belief.

_____
Danny Henderson

Subscribed and sworn to before me by Danny Henderson this _____ day of _____, 2007.

_____
Notary Public
My Commission Expires: 7.9.08

[SEAL]

# EXHIBIT B

# WEDOWEE MEDICAL RECORDS

WEDOWEE HOSPITAL        209 MAIN ST 256-357-2111  WEDOWEE        AL 36278

**EMERGENCY ROOM • OUTPATIENT RECORD**

| EXPIRE DATE 5/23/07 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PATIENT NUMBER 202606 | TYPE 3 | PATIENT NAME HENDERSON DANNY | | AGE 48 | BIRTHDATE 8/01/1958 | SEX M | M/S SW | DATE OF SERVICE 5/23/07 | TIME 16:59 | CLERK INIT. CB |
| ADDRESS - LINE 1 CO RD 87 | | ADDRESS - LINE 2 | | | CITY WOODLAND | | STATE AL | ZIP CODE 36280 | | TELEPHONE |
| PATIENT SSAN 424887167 | | NOTIFY IN CASE OF EMERGENCY - NAME | RELATIONSHIP | | | ADDRESS | | | | TELEPHONE |
| INSURANCE COMPANY | | | | CONTRACT OR GROUP NUMBER | | | DATE | PLACE | | |
| | | | | | | | TIME | EVENT | | |
| GUARANTOR NAME RAND CO SHERIFF DEPT | | GUARANTOR ADDRESS | | CITY | | STATE | ZIP CODE | | GUAR. TELEPHONE | |
| GUARANTOR EMPLOYER RAND CO SHERIFF DEPT | | GUARANTOR OCCUPATION | GUAR. EMPLOYER ADDRESS | | | | | GUAR. EMPL TELEPHONE | | |
| PREV. SERVICE | PREV. SERV. DATE | IF MINOR - PARENT NAME | | | MED. REC. # 027222 | | ADMITTING/2ND PHYSICIAN AHMED SYED/GUNNELLS J | | | |

| CHARGES | X-RAY | LAB | RESP. TH. | PHY. TH. | EKG | I.V. | DRUGS | SUPPLIES | OTHER | M.D. | E.R. RM | TOTAL DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

AUTHORIZATION FOR TREATMENT, GUARANTEE OF PAYMENT, ASSIGNMENT OF INSURANCE BENEFITS

1. The undersigned has been informed of the emergency treatment considered necessary for the above named patient, and that treatment and procedures will be performed by physicians, members of house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures. The undersigned has read the above authorization and understands the same and certify that no guarantee of assurance has been made as to the results that may be obtained.
2. The undersigned agrees to pay for services rendered by hospital upon release of patient.
3. I/we hereby assign any hospital benefits, sick benefits, injury benefits due to a liability of a third party, payable by any party, for the above patient, to Hospital unless I pay the account in full upon release of patient.
4. I/we hereby authorize the Administrator of Hospital to furnish from its records any information requested by the before mentioned insurance companies in connection with the above assignment. I do hereby assign the "controller" of hospital as my lawful attorney in fact in any checks or payable to me the benefits or claims collected under the above assignment and to apply any credit balance to any other account I am now and hereafter.

| DATE | TIME | SIGNED PATIENT | SIGNED GUARANTOR |
|---|---|---|---|

CHIEF COMPLAINT (If Accident State How, When, and Where)        ADVANCED DIRECTIVE
CHEST PAIN

| TEMP. | PULSE | RESP. | B/P | ALLERGIES | MEDICATIONS - HOME | E.R. PHYSICIAN | TRT. TOX. |
|---|---|---|---|---|---|---|---|

NURSES NOTES:

                                                                    NURSE'S SIGNATURE (RN OR LPN)

LAB DATA (Including X-Rays, EKGs, etc.)

PHYSICIAN'S REPORT

CXR 5-24-07
No FU needed
SBRW

# DIAGNOSIS:

TREATMENT:

| | CONDITION ON DISC | | |
|---|---|---|---|
| | IMP | STABLE | EXPIRED |

INSTRUCTIONS TO PATIENT:

FOLLOW-UP WITH
                                                                    M.D.

                                                                    M.D.

PATIENT'S SIGNATURE ON DISCHARGE        DATE - TIME OF DISC.        PHYSICIAN'S SIGNATURE

**WEDOWEE HOSPITAL**
EMERGENCY DEPARTMENT PHYSICIAN RECORD

202606  RM-    027222    P/T-E/P
HENDERSON DANNY    M  48
CO RD 87    WOODLAND    , AL
AHMED SYED    GUNNELLS J
Patient Name:_ GAINES M G    05/23/07  B/D 08/01/58

TIME:____ AGE:___ Wt.:___ CC/HPI_____

REVIEW OF SYSTEMS: If marked (-) after system name indicates all negative.  ( )Pt. unable to furnish systems review information due to ____

CONSTITUTIONAL ( )
Fever/Chills( )
Weakness( )
Wt. Loss( )

EYES ( )
Cataract( )
Corrected Vis.( )
Pain( )
Redness( )

EARS, NOSE, MOUTH, THROAT ( )
Tinnitis( )  Hearing Loss( )
Otalgia( )  Epistaxis( )
Nasal Congestion( )
Dysphagia( )  Odynophagia( )

CARDIOVASCULAR ( )
CP( ) Palpitations( )
Claudication( )
Hx HTN( ) Murmur( ) RF( )
MI( ) Hi Chol.( ) CABG( )
PTCA( )

RESPIRATORY ( )
Cough( ) Wheeze( )
SOB( ) Hemoptysis( )
Pleuritic Pain( )
Hx TB( ) Asthma( )

DI ( )
Heartburn( ) N/V( )
Abd Pain( )
Diarrhea( )
Melena( ) Hematochezia( )

DM ( )
Dysuria( ) Hematurial )
Difficult Urination( )
Abn. Vag. Discharge( )

NEURO ( )
Vertigo( )
HA( ) Syncope( )
Focal Weakness( )
CVA( ) Seizure( )

MUSCULOSKELITAL ( )
Joint Pain( )
Neck/Back Pain( )
Extremity Pain( )

HEMA/LYMPH ( )
Anticoagulation( )
Abnormal Bleeding( )
Swollen Glands( )

SKIN ( )
Significant Rash( )
Itching( )

ENDOCRINE ( )
Goiter( ) DM( )

PSYCHIATRIC ( )

ALLERGY: NKDA    MEDS: SEE NURSING NOTES    LAST TETANUS:    EMERGENCY MED. CONDITION EXISTS?( )

FAMILY HX: (+/-) Heart dx __ Htn __ CVA __ Ca __ DM __    SOCIAL HX: (+/-) Smoker__ Past Smoker__ ETOH____ Other____

PAST/ED/EVAL HX:_____

PHYSICAL EXAM: BP: 204/103 P: 81 R: 22 T: 98.2 SaO2: 97% CONSTITUTIONAL A&O

EYES: 2 RML    EAR, NOSE, MOUTH, THROAT: Nml

HEAD:    NECK: No JVD    RESP: CTA

CV: S₁S₂ RRM

CHEST: Tenderness LT axilla to under LT breast

GU:

MUSCULOSKELETAL: Tenderness LT should c old bullet fragments

LYMPHATIC:    SKIN:    PSYCH:

NEURO:

PHYSICIANS ORDERS:
IV:
INT

MEDS:
O₂ 1-2L

LAB:
H&H ( )
LYTES ( )
BUN/CREAT( )
GLUCOSE ( )
AMYLASE ( )
PT/PTT ( )
CPK ( )
CPK-MB ( )
HCG ( )
BETA-HCG ( )
UA ( )

[✓] CARDIAC MONITOR
[✓] 12 LEAD ECG
[ ] PULSE OXIMETER
[ ] NG TUBE
[ ] FOLEY CATHETER

PROFILES:
CMP ( )
BMP ( )
HEPATIC ( )
LYPTES: ( )
ACETAMIN. ( )
DIGOXIN ( )
CARBOXY-HGB( )
ETOH ( )
PHENYTOIN ( )
SALICYLATE( )
THEOPH. ( )

CULTURES:
BLOOD X ( )
SPUTUM ( )
GC GENITAL ( )
THROAT ( )
STOOL ( )
URINE ( )
WOUND ( )

OTHER LAB:
ABG _____ ( )
URINE DRUG _____
TROPONIN-T_____ ( )
CBC _____ ( )

RADIOLOGY (TRAUMA)
(W/BACKBOARD+CID)
SKULL ( )
C-SPINE ( )
AP/L T-SPINE ( )
AP/L LS-SPINE ( )
AP CXR ( )
AP PELVIS ( )

RADIOLOGY (ROUTINE)
PA/L CXR ( )
PORTABLE CX: ( )

NON-CONTRAST CT:
HEAD ( )
C-SPINE ( )

OLD RECORD REQ. ( )

MEDS: ( ) Clonidine x 2 (PO) SL PR SC IM IV NEB    ( ) Nitroglyc. x (PO) SL PR SC IM IV NEB    ( ) _____ )PO SL PR SC IM IV NEB
( ) Naproxen 250 (PO) SL PR SC IM IV NEB    ( ) Lopressor 50 (PO) SL PR SC IM IV NEB    ( ) _____ )PO SL PR SC IM IV NEB
RESPONSE TO MEDS:    ( ) Tradol 60 (PO) SL PR SC IM IV NEB    ( ) _____ )PO SL PR SC IM IV NEB

TEST RESULTS:

PROCEDURES:

OLD RECORD REVIEWED( )
CRITICAL CARE TIME (MIN)_____

DIFFERENTIAL DX:_____

RE-EVALUATION:
FINAL DIAGNOSIS: Chronic Shoulder Pain, Hx of Bullet Frag

DISCHARGE INSTRUCTIONS/PLAN: ~~Clonidine~~ HCTZ 25 mg q AM Naprosyn 500 BID, Tramadol 50 mg 1-2 q 6 Prn

_____ OTHER(S)_____    ( )ADMIT  ( )TRANSFER

CONSULTED:

PHYSICIAN SIGNATURE:_____    D.O./M.D.    DATE OF SERVICE:_____

# WEDOWEE HOSPITAL

202606  RM-        027222    P/T-E/P
HENDERSON DANNY        M   49
CO RD 87        WOODLAND   , AL
AHMED SYED        GUNNELLS J
GAINES M G        05/23/07  B/D 06/01/58

## EMERGENCY DEPARTMENT NURSING TRIAGE AND ASSESSMENT

| | |
|---|---|
| Pt. Name | Date |
| Family Dr. Gaines | Med Rec # |
| Sign in time | DOB _____ AGE |
| Triage time 1655 | Dr. Eval. <12 Hr?Y( )N |
| Evaluation time 1705 | Advance Directive?( )N |

MODE OF ARRIVAL: POV ✓, Ambulatory ( ), Ambulance ( ), Wheelchair ( )
ACCOMPANIED BY: Self ( ), Relative ( ), Other ✓
STATUS: Emergent ( ), Urgent ( ), Stable ✓ Non-emergent
MOTIFIED: Family ( ), Police ( ), Coroner ( ), DMR ( ), Pt. 1st ( )

ALLERGIES: NKDA

CC/HPI: Sharp pains to (L) Side of chest x 2 days, NA x 3-4 days

PSYCHO-SOCIAL: Ø tobacco, Ø ETOH
PAST HX: Injuries (Davis paralyzed s/p GSW (1992).
CURRENT MEDS: Plavix, Coumarine

PREHOSPITAL TREATMENT/CARE
HRD: None    TIME:
HRD: None    TIME:

VITAL SIGNS  1655
Pre 504 184 204/103    HT: NA    WT: NA    IBT/WT/LMP/LBM - IMMUNIZATION STATUS - INTERVENTIONS  LMP NA  LBM
PULSE: 81    66    LAST TETANUS: NA
RESP: 20    20    PED. IMMUNIZATIONS CURRENT Y( ) N( )
TEMP: 988    IMMOBILIZATION: NA
SA O2: 94    98%    DISPOSITION OF PATIENT'S PERSONAL PROPERTY: c̄ patient
                    OTHER:
        dg room

### NEUROLOGIC
LOC X ___ MIN.  ALERT ✓

| | | | |
|---|---|---|---|
| UNCONSCIOUS | ( ) | CONVULSING | ( ) |
| ORIENTED ✓ | | SPEECH CLEAR | ( ) |
| LETHARGIC | ( ) | SPEECH SLURRED | ( ) |
| AGITATED | ( ) | | |
| COMBATIVE | ( ) | | |

GCS ___ TIME:

NEUROLOGIC (< 5 YEARS)
PLAYFUL Y( ) N( )
IRRITABLE Y( ) N( )
CARING Y( ) N( )
CONSOLABLE Y( ) N( ) NA( )

FONTANELLES (<18 MO)
FLAT ( )    CLOSED ( )
DEPRESSED ( )    SOFT ( )
BULGING ( )

PUPILS PERL ✓
NOT ASSESSED ( )   VA W/O CORR
R          L       OS  /
___ Size (mm)      OD  /
___ Brisk          OU  /
___ Sluggish       VA WITH CORR
___ Fixed          OS  /
                   OD  /
                   OU  /
NECK
NOT ASSESSED ( )
SUPPLE ✓
OTHER

CARDIOVASCULAR
PULSE REGULAR ( ) IRREGULAR ( )
PULSE RDP ___ RR ___
PULSE LDP ___ LR ___

RESPIRATORY
AIRWAY CLEAR ✓
BREATHING Y( ) N( )
NORMAL ___
LABORED ___
RALES/RON. Y( ) N( )
WHEEZING Y( ) N( )
STRIDOR Y( ) N( )
RETRACTIONS Y( ) N( )
NASAL FLARE Y( ) N( )

GASTROINTESTINAL
NOT ASSESSED ( )
ABDOMEN SOFT ( )
FIRM ( )
FLAT ( )
ROUNDED ( )
DISTENDED ( )
TENDER RUQ ( )
TENDER LUQ ( )
TENDER RLQ ( )
TENDER LLQ ( )
BOWEL SOUNDS Y( ) N( )

### GENITOURINARY
NOT ASSESSED ✓
NEGATIVE ( )
FREQUENCY ( )
HEMATURIA ( )
DYSURIA ( )
DISCHARGE ( )

EXTREMITIES
NOT ASSESSED ( )
MOVES ALL FOUR ✓
NEGATIVE ( )
DEFORMITY ( )
DISCOLORATION ( )
EDEMA ( )
TENDERNESS ( )

SKIN
FLUSHED ( )
PALE ( )
CYANOTIC ( )
JAUNDICED ( )
FEVERISH ( )
WARM AND DRY ✓
COLD AND DRY ( )
COOL/DIAPHORETIC ( )
WARM AND MOIST ( )
RASH ( )

WOUND DESCRIPTION

### NARRATIVE

1715) Nitroglycerin 50mg po given ~ SJ
1717) EKG obtained ~ SJ
1740 - #20 IVcath to (R) hand
      flush c̄ NS, c̄ intact ~ SJ
1800 - BP ✓ 185/110 ~ SJ
1800) Clonidine 0.1mg ✓ + po given ~ SJ
1805) Toradol 60mg IM given to
      R.G.M. ~ SJ
1835) Re/VS - 163/105, 71, 95%o.s ~ SJ
1845 Clonidine .1mg + Nitro .4
      po + SL Re 1910  IV removed
      c̄ cannula intact; Naproxen
      250mg x 1 po - SL 1915 D/C
      to care of self; NAD
      noted verbalizes D/C instructions ~
      SJ

### Bottom section
FALL PRECAUTION Y( ) N( ) AT RISK FOR SKIN BREAKDOWN Y( ) NO( )✓
TRANSFER SHEET DONE Y( ) N( ) NA( ) LWBS ( ) AMA ( )
NON-REFUSAL TO TREAT OR AMA FORM SIGNED Y( ) N( ) NA( )
NURSING DIAGNOSIS
ALTERED CARDIAC STATUS ( )    CONDITION AND DISPOSITION
KNOWLEDGE DEFICIT ( )          STABLE ( ) DISCHARGED ✓ TRANSFERRED( ) LWBS ( ) AMA ( )
INEFFECTIVE BREATHING ( )      IMPROVED ( ) ADMITTED ( ) ROOM # ___ VIA: WC BED AND PARENT
INFECTION POTENTIAL ( )        DETERIORATED ( )
POTENTIAL FL. VOL. DEF. ( )    EXPIRED ( ) DATE 5/23/07 TIME 1915
PAIN ( )
ALTERED NEURO STATUS ( )      Stacy Webster, RN    Ma. Coates, RN
ALTERED FAMILY PROC. ( )
TRAUMA RESPONSE ( )
OTHER ___

# Wedowee Hospital
209 Main Street
Wedowee, AL 36278

*01D0304677*
*Karen Stone MD*

| | | | | | |
|---|---|---|---|---|---|
| Name/DOB: | Henderson, Danny  (8/1/1958) | | | Provider: | Jim Gunnells |
| Patient ID: | 424887167 | | Sex:: M | Draw Location: | Emergency Room |
| Received Date: | 5/23/2007 | 5:20 PM | Age: 48 | Sample ID: | 7051889 |
| Draw Date: | 5/23/2007 | 5:20 PM | | Phlebotomist: | Sarah Solana |
| Approval date: | 5/23/2007 | 5:57 PM | Encounter ID: 202606 | Entered by: | Sarah Solana |

## Comprehensive Metabolic Panel (cont'd)

| SS | Ref. Range/Males | 5/23/2007 5:20 PM | |
|---|---|---|---|
| CA | 8.5-10.5 mg/dl | | 9.6 |
| TP | 6.40-8.30 g/dl | | 7.30 |
| ALB | 3.5-5.0 g/dl | | 4.3 |
| TBIL | 0.00-1.50 mg/dl | | 0.70 |
| ALP | 53-128 | | 106 |
| AST | 7-37 | | 14 |
| ALT | 5.0-40.0 | | 13.0 |
| B/C RATIO | 12.00-25.00 Ratio | L | 11.82 |
| ANION GP | 7.00-16.00 mEg/L | L | 6.40 |
| OSMO | 200.00-300.00 MEg/L | | 280.01 |
| A/G RATIO | 1.10-2.20 Ratio | | 1.43 |

## Total CK

| SS | Ref. Range/Males | 5/23/2007 5:20 PM |
|---|---|---|
| CK | 38-174 U/L | 106 |

## Troponin

| SS | Ref. Range/Males | 5/23/2007 5:20 PM |
|---|---|---|
| TROP | 0.01-0.50 ng/ml | 0.03 |

Sample ID:  7051889/2
END OF REPORT (Final)

Reviewed by: _____
Page 2

# Wedowee Hospital

209 Main Street
Wedowee, AL 36278

*01D0304677*
*Karen Stone MD*

| Name/DOB: | Henderson, Danny (8/1/1958) | | | Provider: | Jim Gunnells |
|---|---|---|---|---|---|
| Patient ID: | 424887167 | | Sex: M | Draw Location: | Emergency Room |
| Received Date: | 5/23/2007 | 5:20 PM | Age: 48 | Sample ID: | 7051889 |
| Draw Date: | 5/23/2007 | 5:20 PM | | Phlebotomist: | Sarah Solana |
| Approval date: | 5/23/2007 | 5:57 PM | Encounter ID: 202606 | Entered by: | Sarah Solana |

## Complete Blood Count

| SS | Ref. Range/Males | 5/23/2007 5:20 PM |
|---|---|---|
| WBC | 4.8-10.8 K/ul | 9.7 |
| RBC | 4.70-6.10 M/ul | 5.20 |
| HGB | 13.0-18.0 g/dl | 15.8 |
| HCT | 39.2-52.0 % | 48.2 |
| MCV | 81.0-99.0 fl | 92.7 |
| MCH | 27.0-31.0 pg | 30.4 |
| MCHC | 32.0-37.0 g/dl | 32.8 |
| RDW | 11.50-14.50 % | 12.1 |
| PLT | 130-400 k/ul | 252 |
| MPV | 7.4-10.4 fl | 7.9 |
| NEU% | 42.2-75.2 % | 70.0 |
| NEU# | 1.4-6.5 k/ul | 6.8 |
| LYM% | 20.5-51.1 % | 22.4 |
| LYM# | 1.2-3.4 k/uL | 2.2 |
| MONO% | 1.7-9.3 % | 5.5 |
| MONO# | 0.1-0.6 k/ul | 0.5 |
| EOS % | 0.0-3.0 % | 2.0 |
| EOS# | 0.0-0.7 k/ul | 0.2 |
| BAS % | 0.2-1.0 % | 0.1 |
| BAS# | 1.0-0.1 k/ul | 0.0 |

## Protime

| SS | Ref. Range/Males | 5/23/2007 5:20 PM |
|---|---|---|
| PT | 10.5-12.5 sec | 11.9 |
| INR | Ratio | 1.08 |

## APTT

| SS | Ref. Range/Males | 5/23/2007 5:20 PM |
|---|---|---|
| PTT | 24.9-33.6 sec | L  23.9 |

## Comprehensive Metabolic Panel

| SS | Ref. Range/Males | 5/23/2007 5:20 PM |
|---|---|---|
| GLU | 70-115 mg/dl | H  161 |
| BUN | 5.0-25.0 mg/dl | 13.0 |
| CREA | 0.5-1.5 mg/dl | 1.1 |
| NA | 135.00-145.00 | 138.40 |
| K | 3.50-5.10 | L  3.40 |
| CL | 95.0-110.0 | 106.5 |
| CO2 | 23.00-29.00 | 25.50 |

Sample ID: 7051889/1
This report continues... (Final)

Reviewed by: _____

# WEDOWEE HOSPITAL
## RADIOLOGY REPORT

| | | |
|---|---|---|
| PATIENT: HENDERSON DANNY | STATUS: E/P | DOB: 08/01/1958 |
| ACCOUNT: 202606 | ADMIT: 05/23/07 | SEX: M |
| MED REC: 027222 | DISCH: 05/23/07 | AGE: 48 |
| ROOM: | | SSN: 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 |

ADMITTING PHYSICIAN: SYED AHMED

ORDERING PHYSICIAN: Gunnells

CLINICAL INDICATION: Chest pain

X-RAY NO: 56514

DATE: 05.23.07

EXAMINATION: Portable chest x-ray

FINDINGS: A single, semirecumbent view shows marked elevation of the left hemidiaphragm, of undetermined etiology. Metallic fragments are scattered over the left axilla and upper chest, which appear secondary to prior gunshot wound. There is minimal linear atelectasis or scar in the left lung base; however, the lungs are otherwise clear. The heart does not appear significantly enlarged.

CONCLUSION:
1. Evidence of prior GSW.
2. Marked elevation of the left hemidiaphragm.

DICTATED BY ROBERT EICHELBERGER, M.D. RADIOLOGIST 5/24/07
TRANSCRIBED BY LHW 5/24/07 12:53

SECOND PHYSICIAN: JIM GUNNELLS          Page 1 of 1          FAMILY PHYSICIAN: MICHAEL G GAINES

UNSIGNED TRANSCRIPTIONS ARE PRELIMINARY REPORTS AND DO NOT REPRESENT A MEDICAL OR LEGAL DOCUMENT.
Last printed 5/31/2007 2:30 PM



ID:           #STAT#07052317082l

D.O.B.:
Meds:
Class:
Loc:   1

05/23/2007 17:08:20        ID:   #STAT#07052317082l      05/23/2007 17:08:2(

| Vent. Rate: | 72 bpm |
| RR Interval: | 824 ms |
| PR Interval: | 136 ms |
| QRS Duration: | 102 ms |
| QT Interval: | 412 ms |
| QTc Interval: | 433 ms |
| QT Dispersion: | 52 ms |
| P-R-T AXIS: 48° | 45° 119° |

Sinus rhythm.
Left ventricular hypertrophy
Lateral ST-T changes are probably due to ventricular
hypertrophy

Abnormal ECG

* Unconfirmed Analysi

# EXHIBIT C

# FIRST BLANK REQUEST FORM

# RANDOLPH COUNTY JAIL INMATE REQUEST FORM

INMATE NAME _____     BLOCK _____     DATE _____

STATE YOUR REQUEST: _____

_____

_____

_____

_____

IF MORE SPACE IS NEEDED WRITE ON BACK

## DO NOT WRITE BELOW THIS SPACE FOR REPLY BY STAFF ONLY

_____

_____

_____

_____

_____

APPROVED:                    YES_____     NO_____

OFFICER SIGNATURE _____     DATE _____

## REVIEWED BY ADMINISTRATION:

APPROVED _____

NOT APPROVED _____

REASON FOR CHANGE IF APPLLICABLE: _____

_____

_____

CHIEF OR CAPTAIN'S SIGNATURE _____     DATE _____

# EXHIBIT D

# HENDERSON REQUEST FORM

# 07/09/07

## RANDOLPH COUNTY JAIL
## INMATE REQUEST FORM

NOTE: PLEASE PRINT ALL INFORMATION

NAME: _Danny Henderson_    CELL: _H_
DATE: _July 9, 2007_    TIME: _6:00 am_

PLEASE CHECK ONE OF THE FOLOWING:

_____ MEDICAL    _XX ✓_ GREIVANCE    _____ REQUEST FOR SPECIAL VISIT

_____ OTHER _____

---

BRIEFLY STATE YOUR REQUEST THEN GIVE TO JAIL OFFICER

_Access to Legal Books other than one Bible Book is requested Again. Such Rules are Unconstitutional. Again Requesting Greivance Appeal Procedures if Any._

DO NOT WRITE BELOW THIS LINE—FOR REPLY ONLY

_____

COPIES TO: _____ INMATE
_____ INMATE FILE
_____ DISCIPLINARY HEARING BOARD
_____ OTHER _____

SIGNATURE OF JAIL OFFICER RECEIVING ORIGINAL REQUEST

_Sgt J. R Welford_

DATE: _7-9-07_ TIME: _04:20_

_As stated before you may have any legal materials that your attorney provides. The only exception is hard back materials for security purposes. Copy of grievance procedure forwarded to you._

_07/09/07 @ 1305 hrs._

# EXHIBIT E

# GRIEVANCE PROCEDURE

# SUBMITTED BY DAVIDSON

# 07/09/07

17

PRIVILEGES

1.   The Sheriff, Sheriff's Department personnel, employees of the detention facility, or any of their respective families shall neither profit nor derive benefit from the operation of store call.

2.   The Sheriff shall insure that appropriate transaction records are maintained and kept current.

E.   EXERCISE AND RECREATION

1.   A form of excercise shall be provided for the inmates on a regular basis.

2.   Control of how and when radio and television sets are to be used shall be left to the discretion of the Chief Jailer.

SECTION IX.   MISCELLANEOUS RULES

A.   GRIEVANCE PROCEDURE

The Sheriff shall maintain a system whereby an inmate may request and make a grievance report which shall initiate investigations of alleged mistreatment or abuse of inmates by personnel or other inmates. Upon evidence of such mistreatment or abuse, the Sheriff shall discipline, through established procedures, the offending party.   Written notice of the results of that investigation and of any action taken by the Sheriff shall be directed to the complaining inmate.   That notice shall also be filed in the inmate's personal file and in the employee's file and shall be preserved, open and available for inspection by the Court. The Sheriff shall provide a written report of any mistreatment or abuse of an inmate upon request by any Judge of the Court.

B.   AUDIT AND INSPECTION

1.   All funds, registers, ledgers, or other records required to be kept by the Sheriff in operation of the jail shall be subject to audit on an unscheduled basis by an independent, court-appointed auditor and to inspection by the Court.

2.   The Jail shall be open for unscheduled inspection by the Court or by any individual Judge of such Court.

C.   ISOLATION NOTICE

The Sheriff shall cause prompt notice to be given to the Judge of

# EXHIBIT F

# AFFIDAVIT OF BEN ANDERSON

STATE OF ALABAMA
COUNTY OF RANDOLPH

## AFFIDAVIT

"My name is Ben Anderson. I am currently incarcerated at the Randolph County Jail and have been since October 25, 2006. I plead guilty to a drug crime and am currently awaiting a probation hearing. During my arrest, my leg had a dislocation injury that rendered me severely physically incapacitated for the first couple of weeks during my incarceration and continues to cause a great deal of pain and problems as of the date of this affidavit. During my booking at the jail I was asked if I wanted to see the doctor, which of course I requested due to my emergency condition and sever pain. However, the arresting officer noted on my intake sheet that I had refused to see a doctor. This is untrue and is certainly not what I had indicated. I did however see a doctor while I was in detox approximately one week after my arrest. For the first three days of my incarceration I was given no access to a mat, a blanket, a pillow, shoes, or t-shirt, only a jumpsuit. The first week in detox was hellacious and I was in sever pain, cold and miserable. When I finally saw a doctor I was taken to the jailer's office where several jailers were observing my consultation. I am not sure if I saw a doctor or nurse practioner as the person I saw did not tell me his name. Jailer Krista Traylor, whose husband was the police officer who assisted in my arrest, showed me pictures of her children during my medical consultation, was cursing me in front of the doctor and yelling at me for, according to her, putting her husband's life in danger. Jailer Shirley Johnson observed this behavior and finally made Krista Traylor stop.

During my time with the doctor I was not asked any past medical history and the doctor merely took my vital signs. I attempted to show the doctor my leg but a jailer began to take me out of the room. However, the doctor did call me back and appeared surprised at the condition of my leg. The doctor or nurse practioner prescribed some medication I assumed was an anti-inflammatory but was unsure because I was never told what my prescription was. The first time I was given a prescription there were eight pills with no instruction on how to take the pills. Since my first consultation with the doctor I have filled out no less than five medical request forms but was given no further access to a doctor until my recent attack by another inmate.

I have never received an inmate handbook but when I was booked I was told to sign a document indicating I had received a handbook. Due to the conditions surrounding my arrest and the way I was being treated I did sign the document but no handbook has been furnished to me nor have I ever had the benefit of reviewing a handbook. In addition, I know of no other inmate on my block who has ever received an inmate handbook nor have I ever seen such a document. I was unaware of any grievance policies at the Randolph County Jail, have never been advised about any type policies by any jail officials nor are they posted. My attorney recently informed me about the need to comply with grievance procedures but I have been able to do so due to the fact that I have not been made aware of such procedures even after filing a grievance request form. In addition, my attorney has told me she cannot advise me regarding such procedures as they have not been provided to her.

I am aware and have witnessed inhumane conditions in the Randolph County Jail including raw electrical wiring to the extent that I have witnessed a plumber who came to work in the plumbing get shocked on two occasions with sparks flying around him. On my block there are at least 15 to 20 men at any given time, the bunks are not secured and there are men sleeping under those bunks. I have had two plastic spoons provided to me since my incarceration and have been forced to wash those spoons in the shower and was told I would not be provided any other spoons. My diet is insufficient and those handling my food rarely wear gloves or have hair nets. During the majority of my incarceration I was a pretrial detainee.

I was recently attacked by another inmate after I turned up the television volume while he was talking loudly. The inmate attacked me and proceeded to stab me about my face, head and neck for several minutes. Other inmates managed to break up the altercation but it was approximately 10 to15 minutes before any jailer responded to the pleas of inmates seeking to assist me. I was immediately transported to the emergency room where I was treated for my wounds. Craig Davidson took pictures of my injuries and thereafter I was visited for the first time since my initial incarceration by a Mr. Gunnells. I am unsure if Gunnells is a doctor or a nurse practioner. I was treated with aspirin and antibiotics as follow up from my ER visit. During my consultation with the jail doctor on the Thursday after my release, the entire consultation took approximately five minutes at which time my vitals were taken and my stitches were removed. After my attack, jailers briefly and sporadically manned the "crows nest" outside of the male blocks located in the upstairs of the jail. I still feel unsafe and am concerned about our block not being segregated from violent offenders. In addition, I have witnessed other inmates including Larry Ward, fill out numerous medical requests, sometimes daily or twice daily without any medical care being provided. This information is true and correct to the best of my knowledge."

Dated this _11th_ day of _July_, 2007.

Ben Anderson

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

Ben Anderson, being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of his knowledge and belief.

Ben Anderson

Subscribed and sworn to before me by Ben Anderson this 11th day of July, 2007.

Notary Public

[SEAL]

My Commission Expires: 11-10-09

# EXHIBIT G

# AFFIDAVIT OF SANDRA SHELTON

COUNTY OF RANDOLPH
STATE OF ALABAMA

## AFFIDAVIT

"My name is Sandra Shelton. I am currently incarcerated at the Randolph County Jail and have been since on, or about April 2007. I have been incarcerated at the same jail before in 2005. During both stays I have been denied proper medical care, I have been exposed to horrid conditions, improper sanitation, improper supervision and other inexcusable treatment by jail staff.

During my previous stay in Randolph County Jail I woke up one morning with the left side of my body paralyzed. I was eventually taken out of my cell by a jailer named "Meachey." Meachey took me to the jail office where Craig Davidson was at his desk. Craig told me that nothing was wrong with my face. I told him that my face and other parts of my body were paralyzed but he did nothing to remedy the situation. I was taken back to my cell without treatment. The next day I was sent to court where the judge decided to sent me to Lifetech. Immediately upon my arrival at Lifetech I was seen by a nurse who prescribed medications to assist with my paralysis. The nurse was very concerned about my condition and I was diagnosed with Bells Palsy.

During my current incarceration filled out a medical request form within one week of being locked up. I was denied access to a doctor until on or about May 31st. I was told that there would be a charge of $5 each time I filled out a medical request form and saw the doctor. When I visited with the doctor it was in the jail office where the doctor, his nurse, Craig Davidson, Shirley Johnson, Krista Traylor and others were all present. When I entered the room I had no idea I would be seeing a doctor, I was not introduced nor was I told the doctor's name. During the entirety of my doctor's visit, the jailers were discussing my criminal charges and case with the doctor. As of the date of this affidavit, I do not know for sure the name of the doctor I saw. I was not asked my medical history, I was not allowed to meet with the doctor privately and the doctor did not tell me what medications he was prescribing or what they were for. I explained to the doctor that I was experiencing numbness and tingling in my arm and extreme pain. I asked the doctor if it would help to allow me to continue using two sleeping mats and he said "absolutely." The next day Krista Traylor took my second sleeping mat without reason. There are numerous mats stacked in the jail that no one uses.

During my 2007 incarceration I was locked in the female block with an inmate named Vicki Tucker. Tucker daily threatened to kill me and beat my ass. These threats were aimed toward me in front of jailers Krista Traylor and a jailer named "Stacy." Krista Traylor threatened to spray me with mace if I continued to complain about Tucker's aggression and threats. Both jailers ignored the threats and Stacy even opened my cell door for 30 minutes unattended for no reason so that Vicki could have access to my cell.

1

The Friday after my visit with the doctor I began experiencing dizziness again and a cell mate, Pam Allen, informed the jailer I should be checked on. I do not remember everything that happened but I was dizzy and could not feel the left side of my body. I could not remember phone numbers or my children's birth dates. I did not receive medical care and was told I could not call my attorney until I was no longer upset. I was in a cell with no lights, no running water and no assistance for three days. The jailers told me I was being locked down for passing notes. I had given a female inmate who was leaving the address to a friend of mine outside the jail. The jailer saw me hand this information to the inmate but made no comment and I was never told it was against the rules. During my time in "lockdown" I was slipped medications under the door for which I was not told the name of the drugs, what they were for nor was I given water with the pills. I could not take the medication at the time given and had to wait until I was given one cup of water during lunch. On the Sunday during my "lockdown" I was not allowed to go outside for my weekly thirty minute visit even though men who are locked down are allowed outside exercise.

Other bad conditions at the jail include no access to sinks or showers on the side of the female cell block I am assigned to. There is one shower that works for all female inmates on the block. There is very little lighting in the female block. One side of the cell block was closed off for the first six weeks I was incarcerated. This side of the female block is closest to the jail office and with the door shut it is almost impossible for the jailers to hear our screams and cries for assistance. If Vicki Tucker would have chosen to beat me there would have been no way the guards would have heard. My cellmate Pam Allen is being threatened daily by a new inmate named Catheta. She opens Pam's door at night screaming, "I will muck you up." Pam is terrified. I am scared that I will be hurt and not receive proper medical care."

Sandra Shelton
Sandra Shelton

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

Sandra Shelton, being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of her knowledge and belief.

_Sandra Shelton_
Sandra Shelton

Subscribed and sworn to before me by Sandra Shelton this 8 day of June, 2007.

_Shannon Anthony_
Notary Public
My Commission Expires: 7-31-07

[SEAL]

3

STATE OF ALABAMA
COUNTY OF RANDOLPH

## SUPPLEMENTAL AFFIDAVIT

"My name is Sandra Shelton. On June 6, 2007, I saw Dr. Gunnells for the second time since my incarceration. At that time I asked him if he would do my medical consult in private. The doctor said, "your attorney must have told you to say this and I am exercising my right not to give you a private medical consultation". Krista Traylor and other jailers were present but Shirley Johnson told all the jailers to leave so that I could have a private medical consultation. The doctor indicated that I may have mini strokes but he could not diagnose the issues since it had been at least five days since I had the original problem. During my consult with Dr. Gunnells I asked him if the extra mat I had previously been provided was "medically necessary" and he indicated it was. When I was going back to my cell, Krista Traylor refused to give me a mat even though I insisted the doctor told me it was medically necessary for me to have the mat. At that time the doctor yelled out that he insisted I have an extra mat as it was medically necessary. The doctor informed me that anytime I feel symptoms related to my condition I should immediately request medical attention. For the first time I was asked more about my medical history. Although I have not been given information on the medicine I am taking, and for how long I will be taking it, the doctor told me that I had been given Naprosen and also some sort of seizure medication. The doctor also informed me I cannot be fully treated until I am correctly diagnosed and this must be done when the actual incidents are occurring. As of June 8, 2007, Cathelia, the other inmate I had previously complained of for harassing Pam Allen and others was put on lock down.

I have never been informed of a grievance policy at the Randolph County Jail, I have not received any instructions on how to file grievance, I was never given an inmate hand book, nor have I been informed of any rights or procedures that I may have as a result of any jail policies. This information is true and correct to my knowledge."

Sandra Shelton
Sandra Shelton

STATE OF ALABAMA
COUNTY OF RANDOLPH

Sandra Shelton, being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of her knowledge and belief.

Sandra Shelton

Subscribed and sworn to before me by Sandra Shelton this _11th_ day of _July_, 2007.

Notary Public

[SEAL]

My Commission Expires: _11-10-09_

# EXHIBIT H

# AFFIDAVIT OF LARRY WARD

STATE OF ALABAMA
COUNTY OF RANDOLPH

## AFFIDAVIT

"My name is Larry Ward, Jr.. I have been incarcerated in Randolph County Jail for approximately 9 months. During that time I witnesses first hand the horrible, filthy, and inhumane conditions at the jail. Most specifically, I have seen the horrid untreated medical conditions many people live with. In particular I remember inmate Archie Harmon. Archie was here with me approximately one and one half weeks after my initial incarceration before he passed out on my block and was sent to the hospital where he later died. During the one and one half week period I was incarcerated on the block with Archie I filled out at least 2 medical requests forms for Archie that I remember. I also remember Archie filling out at least one medical request form on his own. Archie experienced extreme stomach pain which required immediate attention which he never received. Archie was most often bent over grabbing his stomach, coughing, and at least two times was up all night throwing up during this stay in my block. One evening around 3:00 a.m. I heard Archie mumble and fall down where he hit his head. He immediately woke up and was convulsing large amounts of dark blood. After approximately 10 minutes of inmates banging and screaming a jailer entered the block and took everyone out of the block except for Archie. We were put in detox where approximately 15 of us stayed most of the night. We could not see what happened next but when we went back to our block there was no blood and we were later told that Archie had died about a week later. Archie had told me and others that he had ulcers before being incarcerated and he was in extreme pain and felt that he needed immediate attention.

I also had medical issues not attended to including a ongoing tooth problem for which I filled out at least three medical request **per week** for the first three months I was incarcerated. It was approximately three months before I saw a doctor regarding this problem. My first request was approximately two weeks after I was incarcerated and my cavity became unbearable. I was told it would be free the first time I saw the doctor and when I did see a doctor it was nurse practioner, Ricky Daniels. I had no full physical performed upon my entrance into the jail nor have I had one during my incarceration. Ricky Daniels prescribed two Tylenol 400 mg everyday for which I still purchase from the commissary at the cost of $1.00 per week. When I asked Craig Davidson how to get a dentist appointment he told me Ricky Daniels himself would have to make the dentist appointment. When I finally saw Daniels he told Craig that he needed to get me the dentist appointment. I saw Ricky approximately three more times and had to pay $5.00 every time out of commissary for each visit. My vital signs were never taken, I was simply asked what was wrong each time the nurse practioner visited.

I spent about $20.00 a week in Advil for which I wrote on each commissary sheet that I was in extreme tooth pain so the jailers would not think I was abusing the Advil. Each time I saw Daniels he told my to keep taking my Tylenol but offered no solutions for my intense pain. When I finally was taken to dentist, Dr. Towers pulled my tooth but offered no pain pills only one shot. He also told my another tooth needed to be pulled but I was scared about having such a big hole in my head being in the conditions I was in and possibly being exposed to Hepatitis, AIDS, staph or other issues. I was given antibiotics to take for one week and once that tooth healed I began making

other requests to see the dentist to get the other tooth pulled. It took approximately three more months and three medical requests per week on average for me to get back to the dentist. Each time I filled out my requests form I asked for copies to be given back to me and have never received one. I have had numerous guards to sign saying they received my requests including jailers Smith, Wilkes and Matt. After the second tooth was pulled I was given no antibiotics and was constantly concerned about my exposure to disease.

I have also been subject to at least two strip searches during my incarceration for which no explanation was given. The first time the whole dorm was searched sometime between March and May of 2007. We were searched one by one completely nude and were forced to bend over and cough. The first time jailer Matt and Jimmy Wilkes searched us. The second time we were searched by Jimmy Wilkes alone.

In addition to the horrid medical conditions we are also exposed to other safety issues. Those include raw electrical wires, having to reuse plastic spoons (I have had four spoons in the ten months I have been here), the spoons we are given are stored in some metal holding container with no liner and no sanitary handling. I have been housed in "B" Block which has six toilets for which up until recently only three worked. Only one shower works where we are required to get all of our drinking water and water for cleaning. There is what appears to be a "220" wire behind the toilet where I saw an electrician get shocked trying to repair it. There are currently 13 or 14 men housed on my block but at least 20 were there at one time. I have seen Nosqualius Blake in pain on several occasions when he was complaining of back and kidney pain. To my knowledge no jailer has ever assisted him with his issues.

There is a light blonde male in my block whom we call "Odie". Odie has informed me that he has cancer and is not allowed to get all of his proper medication or his special diet requested by his doctor for treatment of his cancer. He is not being given the proper food and often carries his head around complaining of a disc problem in his back. He has filled out several medical request forms and I am very often concerned about Odie's health.

I was a witness to Ben Anderson being beat on Sunday, June 10, 2007. Ben was stabbed repeatedly with a pen by another inmate. It took approximately 15 minutes for any jailer to come to Mr. Anderson's aid. Immediately after that fight another fight broke out in another block between inmate Jeffery East and another inmate. I am not sure what happened with this fight due to the fact I was unable to see all of the happenings. This information is true and correct to the best of my knowledge.

During my incarceration I have never received an inmate handbook, instructions for a grievance policy, or have been instructed how to fill out grievance requests. The only way I have known that I must fill out a medical request form is by witnessing other inmates do so or being told to fill out such a request by jailers after I have told them I did not feel well and felt I need medical or dental attention. To my knowledge no grievance policy is posted nor were any inmates informed of such a policy."

" During the term of my incarceration, I have never been given a physical or Health screen by a doctor, Nurse, practitioner or any health professional."

_Larry Ward, Jr._

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

Larry Ward, Jr., being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of his knowledge and belief.

_Larry Ward, Jr._

Subscribed and sworn to before me by Larry Ward, Jr. this 11th day of July, 2007.

_April Moore_
Notary Public

[SEAL]                          My Commission Expires: 11-10-09

# EXHIBIT I

# AFFIDAVIT OF NOSQUALIUS BLAKE

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

## AFFIDAVIT

"My name is Nosqualius Blake. I have been incarcerated in Randolph Jail for approximately _____ months. During that time I have filled out and submitted approximately 10 to 15 medical requests for issues I have had including stomach problems and an ongoing tooth issue. During the first three weeks of my incarceration I was unable to have a bowel movement and often complained of sever pain to jailers who ignored my pleas. My medical requests were also ignored in regards to this issue. The only way I was able to use the bathroom was to begin drinking a great quantity of coffee so I could alleviate my own pain. My stomach, back and buttocks hurt and I was in sever pain during the first three weeks of my incarceration. In addition, I had sever headaches that scared my to the point I felt like was dying and often begged the jailers for help but they never assisted. I asked for a doctor two times each week during the first two weeks I was incarcerated and to date have seen a doctor only twice which included the week of June 4 and also on June 14, 2007. During my visit with the doctor he asked me why I had not asked to see him in the past and I explained to him I have filled out numerous medical requests. Due to the issue with my extremely corroded and rotten tooth the doctor gave me antibiotics. To date I still have not seen a dentist even though my tooth is almost completely rotted. During my visit with who I thought was a doctor, but later found out was a nurse practioner, Craig Davidson, Shirley Johnson and at least three to four other jailers were present during my exam by the doctor. I was not given a physical when I was first incarcerated and my vital signs have not been taken.  It was approximately one and a half months before I first went outside after being incarcerated. Quiet often the jailers chose to skip our Sunday, 30 minute exercise time for no apparent reason. An explanation is never given.

I also witnessed the attack on inmate Ben Anderson which occurred on Sunday, June 10, 2007. Ben was viciously attacked by another inmate who stabbed him repeatedly with a pen in the neck and head area. In addition, the inmate stomped Ben in his chest. Inmates banged on the door and screamed for approximately 15 minutes before the jailer came to assist Ben.

I have never been informed of a grievance policy at the Randolph County Jail, I have not received any instructions on how to file grievance, I was never given an inmate hand book, nor have I been informed of any rights or procedures that I may have as a result of any jail policies. This information is true and correct to my knowledge."

Dated this ____ day of _____, 2007.

" I filled Out a inmate Greviance form on or about June 15 2007 regarding my medical problem and I have received no respece to my Greviance as of July 11. 2007. my Lawyer told me to field out a Greviance that is the only way I had to do so - Nosqualius Blake

_Nosqualius J. Blake_
Nosqualius Blake

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

Nosqualius Blake, being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of his knowledge and belief.

_Nosqualius J. Blake_
Nosqualius Blake

Subscribed and sworn to before me by Nosqualius Blake this 11th day of July, 2007.

_April Moore_
Notary Public

[SEAL]                                   My Commission Expires: 11-10-09

# EXHIBIT J

# AFFIDAVIT OF LINWOOD JOHNSON

STATE OF ALABAMA
COUNTY OF RANDOLPH

## AFFIDAVIT

"My name is Linwood Johnson and I was an inmate at the Randolph County Jail from February 6, 2007 until May 28, 2007. During incarceration I had several medical problems for which I filled out at least 3 medical request form which remained unanswered. Those included bleeding sinuses, ongoing back problems and exposure to staph and other health issues. I had experienced no such problems until I entered Randolph County Jail. I had one health screen which was given by Nurse Practioner Ricky Daniels and I saw no other health care professional during my time in jail.

I was on "B" Block which was designed for 6 beds and averaged 18 inmates during my stay. At one point there were 22 inmates on my block. At one time there were at least 3 people with untreated staph infections on my block. Only 4 of the 6 toilets were operational, none of the sinks worked, exposed hot electrical wires on the floor and ceiling and people slept under toilets. I was given one plastic spoon and one plastic cup which I was expected to wash in the shower and I had to use these for each meal without replacement.

An ongoing concern was lack of safety and supervision. There was never supervision from the crows nest. Other than dispersement of meals we were never checked on. If inmates needed attention due to fights, etc we had to kick the doors loudly for long periods of time before someone would show up. During my stay several inmates had serious health conditions. Among those were Brandon Poole who had heart stints and unmonitored blood pressure issues, Ben Anderson who had an ongoing knee injury and Josh, whose last name is unknown, who had staples in his head that were infected. We were told we could only have religious material, specifically the Bible, and no books that were not religious."

_____
Linwood Johnson

STATE OF ALABAMA
COUNTY OF RANDOLPH

Linwood Johnson, being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of his knowledge and belief.

_____
Linwood Johnson

Subscribed and sworn to before me by Linwood Johnson this 31 day of May, 2007.

Shannon Anthony
_____
Notary Public

[SEAL]                                              My Commission Expires: 7-31-07

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

### SUPPLEMENTAL AFFIDAVIT

"I have never been informed of a grievance policy at the Randolph County Jail, I have not received any instructions on how to file grievance, I was never given an inmate hand book, nor have I been informed of any rights or procedures that I may have as a result of any jail policies. This information is true and correct to my knowledge."

_____
Linwood Johnson

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

Linwood Johnson, being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of his knowledge and belief.

_____
Linwood Johnson

Subscribed and sworn to before me by Linwood Johnson this 13th day of July, 2007.

_____
Notary Public

[SEAL]                                    My Commission Expires: 11-10-09

# EXHIBIT K

# AFFIDAVIT OF KENNETH HOUSTON

**COUNTY OF RANDOLPH**
**STATE OF ALABAMA**

<u>**AFFIDAVIT**</u>

"My name is Kenneth Houston. I am currently incarcerated at the Randolph County Jail and have been since on, or about April 11, 2007. I have witnessed the deplorable conditions at the jail including exposed electrical wire hanging from lights, one of five toilets work for 15-20 inmates, mean sleeping under toilets and other issues. We are forced to use mop water to clean toilet and sink even though we request clorox and cleaning supplies.

About three weeks ago a man on my block, Larry Whitt (I am not sure of his last name) tried to hang himself in a cell we call the dungeon. He used a shoe string and fell of the bottom rack. The inmates tried to get the guards attention by banging on the door and yelling. The guard ignored us and fortunately the string broke. The guard came back an hour or so later. The man could have easily died just as one did last year. Another inmate, Everett Pauley has cancer and is in constant pain. A man on another block, Mario Broom, had a seizure and the guards told a trustee to watch him."

Kenneth Houston

**STATE OF ALABAMA**
**COUNTY OF RANDOLPH**

Kenneth Houston, being by me duly sworn, declares that the above statements in the foregoing pleading are true and correct to the best of his knowledge and belief.

Kenneth Houston

Subscribed and sworn to before me by Kenneth Houston this _8th_ day of _June_, 2007.

Notary Public

[SEAL]

My Commission Expires: _7-31-07_

# EXHIBIT L

## *THE PEOPLE'S VOICE*

## 04/13/2007

P. O. BOX 314, ROANOKE, AL 36274     **April 13, 2007 – April 20, 2007**   $ .50 Cents

# WHILE DEBATE CONTINUES, COUNTY JAIL INMATES LIVE UNDER GRAVE CONDITIONS



Shown in this photo, is one of the shower-stalls in Randolph County's jail facility, which is no longer operational. Other jail photos are being posted at our website at www.peoplesvoiceweb.com

Charlotte A. Clark-Frieson, Associate Editor
(Wedowee, Alabama)

Monday, April 9, 2007

The Randolph County Commission met at 9:00 A.M. on Monday morning, April 9, in the Courthouse Annex. Though the Commission discussed several routine matters, much of their talking revolved around the deplorable conditions of Randolph County's jail facility, and the enormous expense of maintaining the jail in its current condition. The building, which was constructed in the early 1980's, is 24 years old, and it's plumbing -- among other things -- is deteriorating, which creates a hazardous environment.

It is quite evident from their discussions in Commission meeting, that they are all moved by a sense of duty, to build a clean, safe, facility in which to house inmates. Commissioner Lathonia Wright expressed most fervently, his desire to build a new jail before a Federal Judge orders the county to build one. Wright says, "If we can go ahead and work out a way to do it, we can build a jail cheaper than if a Federal Judge orders us to do it, and we have to end up building one in a hurry without the time to properly plan for it."

Their goal is to construct a facility that will comfortably accommodate at least 250 inmates. Along with the duty to build a new jail, the Commissioners are also faced with the question of how they will finance the construction of a jail facility that could cost the county as much as 4,000,000.00.

Randolph County already has a 1cent sales tax in place, which the Commission approved four to five years ago, for capital improvements to the schools in the county. The 1 cent sales tax now generates $1,800,000.00 a year, and 100% of the funds are used for schools (County and City). But now, in light of the need to construct a new jail they want to change the way the 1 cent sales tax is used.

In its previous meetings and sessions, the Commissioners agreed to pursue a plan whereby (using the same 1 cent sales tax) the money

PLEASE SEE "GRAVE CONDITIONS"   (P A2)

A2

The Peoples Voice African American Weekly News,  Friday, April 13, 2007

# Grave Conditions  (Continued From Front Page)

generated from the tax would be split 50/40/10. Under this plan, the schools would get half of the tax money; the county would get 40% (which would be used to build the new jail), and 10% would go to local volunteer fire departments. By dividing the money 50/40/10, the Commission believes it could finance the construction of a 4,000,000.00 jail. If they can get their plan approved, it would mean the Commission would have the money needed to float a bond issue that would provide adequate funding for construction, maintenance and operation of a new jail. In support of their plan, they had previously passed a resolution to carry out their plan. Their resolution had been sent to State Representative Richard Laird.

In dollars, this division of the tax money, would translate into $900,000.00 for education; $720,000.00 for jail construction; and $180,000.00 for Volunteer Fire Departments.

The reason why this tax is even possible is because the law already empowers County Commissions to impose a 1 cent sales tax for education purposes only, and according to the law, the tax must be approved annually. The Commission does not have the power to permanently impose a tax.

Because the Commission can't impose a tax for any purpose other than education, their efforts reached an impasse because some kind of legislation is needed before they can change the way the 1 cent sales tax is being used.  Any other use of the tax money would require either a change in the law, or vote of the people.

So, during Monday's meeting, the Commissioners decided to take their question to State Representative Richard Laird, by scheduling another meeting that would take place later that day in Laird's office to discuss the status of their resolution. Their goal was to try to get the question on the upcoming June ballot.

## JAIL TOUR

During the hours between Monday morning's Commission meeting, and the evening meeting with Representative Laird, The People's Voice requested a tour of the County Jail. We wanted to know what it was like inside the jail; and wanted to have a eye-witness observation of the conditions and concerns the Commissioners had discussed in Monday's meeting.

Accompanied by Commissioner Lathonia Wright, The People's Voice did a walk-through, touring the various areas of the jail, where personnel gladly pointed out the haz-

ards and structural problems in the jail facility. One of the first problems could be seen upon entering the jail. In the area just outside the jailer's office, ceiling tiles were missing, exposing faulty, leaky, corroded plumbing fixtures where, if one is not careful, plumbing leaks will drop right on top of the head.  There was a trash can sitting right in the middle of the floor, to catch the drainage from the dripping overhead plumbing pipe.

Loose floor tile could be seen throughout the building as a result of water damage. There were many areas where water just stands. There is evidence of extensive water damage to several of the walls throughout the building, which manifests in the form of mildew on the concrete walls.  Leaks were seen In the kitchen. The leaks appeared to be coming from the toilets and bathrooms in the jail cells, which are located directly above the kitchen. This water leaks into the area where food is both stored and prepared.

The most disparaging part of the visit was to the area where inmates are held. On that day, there were 76 inmates being held in a facility built to accommodate 36 people. The building was tight and crowded. People must live and work in close quarters.  It is hot, humid, stuffy, and stinking. There is in the air, a nauseat-

ing mixture of odors, some coming from the lingering mildew and dampness that is constantly there, the food that is stored and prepared in the kitchen area; and the natural scent given off by human life processes.

Inmates are packed like sardines in day-rooms no bigger than a small bedroom, where as many as 40 men have to share two toilets and two shower stalls.  Bedding and blankets are ragged and fragmented. Many of the inmates sleep on thin worn-out pads doubled up in corners, and on concrete floors.  There is exposed wiring inside the cells, where lighting fixtures are either badly damaged, or nonexistent. There is not a single shower in the building that does not look like it's infected with some kind of deadly disease.  We are hard-pressed to understand why the building has not been condemned because of its overcrowded and hazardous conditions, where inmates are held to too-close proximity.  It was a stomach-turning experience.  It is unhealthy, hazardous and inhumane.

Additional photographs of Randolph County's jail will be posted on our webisite at http://www.peoplesvoiceweb.com.

## 5:30 P.M. Meeting With Representative Laird

**Focus of the Meeting:**

The Commissioners went to meet with State Representative Richard Laird to try to get some understanding about re-distributing the 1 cent sales tax. From all appearances, they were under the impression that they could get the question placed on the upcoming June ballot. However, in a phone conversation with Laird during the Commission meeting that morning, Laird had suggested that they call a "Special Election," which none of the Commissioners want to do, because it will cost the county $68,000.00 to hold a special election.

Laird explained to the Commissioners that it was too late to get anything on the upcoming June ballot, because of the procedures and time it would take to get a referendum on the ballot. Moreover, Laird explained that the Governor had some pressing issues he wanted placed on the ballot, and did not want any other issues cluttering up the June ballot.

The meeting lasted almost two hours, and at times the focus was obscured by frequent asides. There seemed to be a lot of confusion about what the Commissioners want from State Representative Laird. The Commissioners emphasized that they wanted a piece of legislation fashioned after one in effect in Escambia and Houston counties. They explained that they wanted the latitude and flexibility to negotiate with the local Boards of Education, and "agree" on how the tax money is distributed.

To sum up, however, the Commission can not commence any building plans until they know they will have the power to re-distribute the 1 cent sales tax. For the time being, the money must go to Education, unless the taxpayers vote to empower them to change the way it is used. So, they cannot put their 50/40/10 plan into effect until an election is held. State Representative Laird cannot place the question on the upcoming June ballot. Prior to any voting, public Hearings will need to be held, so that the citizens will have the opportunity to learn about what is at stake, have input, and make informed decisions about the issue. The earliest date it can be voted on would be February, 2008, if the Commissioners gets everything in to Laird by late November or December of this year. Laird emphasized that he would not put in a tax without a vote of the people.

The Commissioners want the public to understand that their plan would not result in the creation of a new tax. All the Commission is asking the voters to do is to re-distribute the same tax that people are already paying.

# EXHIBIT M

## *THE PEOPLE'S VOICE*

### 05/11/2007

# THE PEOPLE'S VOICE

VOL. II No. 22

© 2005-2007 The People's Voice

WWW.PEOPLESVOICEWEB.COM

P.O. BOX 514, ROANOKE, AL 36274

May 11, 2007    $.50 Cents

# 17 Years, County Jail Has Been Commissioner's Personal Cross To Bear



Randolph County Commissioner Lathonia J. Wright has served on the Randolph County Commission for 17 years.

**Charlotte A. Clark-Frieson**
Associate Editor

Wedowee, Alabama
Randolph County's first and only black Commissioner, Lathonia Wright says that in many respects, Randolph County's jail has been his personal cross to bear.

By no means the easiest or most popular of duties that come under the jurisdiction of the County Commission, oversight of the jail has probably made Wright it's closest watchman and strongest advocate.

"During previous administrations, the Commissioners appointed the Chairman to oversee the courthouse and the jail. As a result, any complaints about the jail are placed at my feet, but often, they end up on my heart. I don't make the decisions but I take it back and present it to the Commissioners and say, 'Here's the situation...'"

Why that? He was asked. "I guess, because they know I'm concerned; they know my passion for the jail, and there are more blacks incarcerated than white."

But Wright confesses, "I used to take it home with me, but I had to let it go, because I don't want to have

a heart attack and die from it. If I just worried 24-7 about the thing...I mean, we've got seventy-something inmates in there... I believe the stress of it would kill me."

Commissioner Lathonia Wright, who was elected to the Commission in Roanoke, says, "Almost immediately after I came on board, in November of 1990, says, "Almost immediately after I came on board, overcrowding in the jail developed into a growing problem. Down through the years, I've witnessed the deterioration of the building, we've had jail riots. It's disturbing. Some of the overcrowding was due to the county having to hold state prisoners, because of overcrowding in the state correctional facilities."

A major question was "Is it absolutely necessary that everybody there be incarcerated?"

I think judges at times, in certain situations do take that into consideration, deciding not to incarcerate, especially for first time offenders.

We tip our hat to Judge Whaley for initiating the Community Service Program. In minor cases, if you'll do a certain number of days of community service, I've seen him decide not to incarcerate.

I am against incarcerating deadbeat dads and moms. We need to provide some other alternatives for them.

Wright, a Bishop and founding pastor of New Life Worship Center in Roanoke, says, "Drug addicts don't need to be incarcerated. They need deliverance.

We have to come up with innovative programs to show people who've gone down the wrong road, a better way."

Wright can quote all kinds of facts and figures about the jail: legal requirements, populations and statistics, cost of repairs, when it was built, how it is funded, the cost to build a new facility. When it comes to Randolph County's jail, he knows his stuff.

Wright recalls, "Randolph County was a party to some of the lawsuits, that the Association of County Commissioners filed against the State for not removing State inmates in a timely manner from County facilities. So, I would often go by the jail to find out how many state inmates were there; how many have been sentenced and gone past their 30 days? I've literally gotten on my

PLEASE SEE COMMISSIONER WRIGHT, PAGE A3

## Accused women To Appear In Lanett's Mayor Willing To Help But

**The Peoples Voice African American Weekly News, Friday, May 11, 2007**

# Commissioner Wright, Continued From Front Page

phone and called the State Department of Corrections at my own expense, and said, we need to move this inmate or that inmate. They would claim they couldn't get anybody. The last time I called, the former Director told the Chief, "Don't have Commissioner Wright call any more, because I'd call them and tell them, come get their inmates.

I'll still call if I have to.

Wright was elected in November of 1990, almost seventeen years ago. He says for the 17 years he's been in office, he has had to hear practically every complaint about the county jail. "During the first ten years of my tenure, I went there probably once or twice a week. I've even eaten the food over there...but, after the jail riots, it just got to be too stressful."

"The law says that The Commissioners are responsible to provide the the financial means to take care of the jail. That's the first thing that comes out of the budget. We pinch pennies and try to do the best we can. But I know that we can't pinch pennies and build a new jail.

I have personally gotten on my phone and made phone calls to commercial electricians to come and make major electrical repairs to the jail. I used to try to oversee the maintenance of the jail, even though it is the Chief Jailer's job.

The present jail, which he says is outdated, was built in the mid-1980's, was built to house 36 inmates under a mandate by a Federal Judge. "I've seen the population grow from an average of 40 a day, up to roughly 70 inmates."

The money for jail

maintenance and upkeep comes from ad valorem taxes, automobile tags and taxes, sales taxes, TVA (Tennessee Valley Water Authority), and Court Costs imposed on individuals found guilty of crimes.

"In 2000, when I was chairman, I had my colleagues set up a blue-ribbon commission, to study the jail and make recommendations for resolving the problems that are in the jail. Each commissioner appointed one representative. We had Representative Laird and Senator Gerald Dial, the Mayors of each city, the Chiefs of Police, District Judge, Circuit Judge. We had cooperation from everyone but the City Of Roanoke. Then Mayor Betty Ziglar nor the Chief of Police Charlie Harris ever showed up. I have copies in my files, of letters that we sent to them notifying them of the meetings. The meetings were usually on Saturday morning, at the Hub Restaurant. They never came to a single meeting. After about six months of meeting, the consensus was that we need to build a new jail, We deliberated over how are could come up with the money to build the jail. So, we had someone to design some preliminary plans, so we could come up with an estimate and look at ways to generate the revenue to build the jail. As a result, Representative Laird and Senator Dial concluded that a court cost increase was the way to get the money.

One of my concerns about increasing court costs was that I knew that most of the people arrested were blacks, but I was willing to give in knowing that we needed a jail, and overcrowding is not safe... even healthwise it's not safe diseases, fire hazards, these are

all concerns.

A bill would have to be passed in the legislature to enact that. Representative Laird, and Senator Dial did what they had to do to get the local bill. When the City of Roanoke saw it being advertised in the paper, the Chief calls me one day....

"I need to talk to you!"

I thought it was an emergency. I drove from Wedowee down to the Police Department; he's cursing, and fighting mad! "What in the so-in-so is going on?

I said, well we invited you all to the meetings, you never showed up. So, we fussed, we fussed, the Commissioners and Roanoke's Mayor and Police Chief. Not the City Council. That was one reason why the Commissioners were glad to see a new Mayor elected in Roanoke, because we thought we'd have somebody who would work with us. It had gotten that bad. The City wouldn't even come to the meetings, wouldn't even send a representative. Could have sent a council member. Wouldn't do that.

We were excited, because we thought we would have a much better working relationship. We actually wanted a City-County Jail somewhat situated between Roanoke and Wedowee. We were looking at Needham's Hill, the old Hub Trucking Facility. We met with the Mayor once or twice, and then some other things politically came up, and I think he got upset with a couple of the Commissioners, and the next thing we know the City of Roanoke is building a new jail.

We had to go on and take care of business. So, eventually what happened was, we had to compromise. This meant eliminating Roanoke from the plan. That means that we don't get anything from the court cost charged in Roanoke. But, the felonies that occur in Roanoke, the City can't handle them. We have to handle that.

So, with the many road-blocks to funding for a jail, what can or will the Commission do?

When asked if he felt legalizing the sale of alcohol could potentially help our situation, Wright stated that according to studies conducted about 6 to 8 years ago, the county would lose more than it would gain from legalizing alcohol. "The county gets roughly $180,000.00 to $200,000.00 a year from T-V-A, because it stays dry. If we legalize the sale of alcohol, we would lose T-V-A money. However, he admitted that there have not really been any studies done to indicate how much money the county would gain from the legalization of alcohol.

"I don't advocate for, or against. Matter of fact, it's already wet. You'll probably find more more beer cans in Randolph County than soda pop bottles. I don't drink, I tell my congregation, don't drink. But, if it is legalized, the Commission is not going to turn the money down."

Wright is the only Commissioner who does not charge the county for in-county mileage. He is the only Commissioner who does not drive a vehicle provided by the county. He says the only time he charges the county mileage is when he drives his car out of town to attend meetings, otherwise, he travels locally at his own expense. "The only thing I have that the County pays for is a SouthernLink Phone, for which they pay half the expense, and I pay half."

Despite the fact that most of his 17 years on the Commission, this jail has been his personal cross to bear, Wright says, "I would like to run one more time. I'd like to stay on the Commission long enough to oversee the building of a new jail, through to completion. I know we'll eventually get one. We will either find a way to do it, or a Federal Judge will order us to do it, in which case, the State Legislature will have to come up with the money."

## PEOPLE'S VOICE

Awesome things are possible when black folks get together! Each weekly issue of The People's Voice is a gathering where we carry on constructive conversations about black progress and empowerment.

You are invited to join this weekly gathering of the heart and soul of East Central Alabama and West Central Georgia.

AND WATCH US GROW!



*Need To Go Shopping?* Plane To Catch?

*Gas Prices*

**RIDE**



*People's Expr*

*safe, dependable AND*

**Dial-A-Ride**

Fares based on distance

Service available to East A 412 S. Greenwood Stree AL, YATES, Dire

## OUR 3 MOST PI



## BLACK DOLLAR



# Mayor Willing To Help, Continued From Front Page

time, when they don't have it?

I have. That's what I did with those people who owed us that $1.4 million. And do you think they paid it? They paid a little bit of it, and they still

when I'm not helping them, or my church or some organization of this city. I'm on the Valley United Fund. We raise money to give the different agencies that help people in need. I can help

# EXHIBIT N

## *THE RANDOLPH LEADER*

## 05/31/2007

The Randolph Leader: News

Page 1 of 4

Randolph County's *Daily* Local News Source

# The Randolph Leade



Thursday, May 31, 2007 - Roanoke, Alabama

**Local Weather**



87
forecast...

**Sections**

Front Page
News
Sports
Obituaries
Opinion
Calendar
Classifieds
Public Notices
Financial
Food
Health

**Special Sections**

graduation 2007

**Services**

Subscribe
About Us
Archives
Advertising
Buy a Photo
Guestbook
Reader
Submissions
 - Place an Ad
 - Press Release
 - Letter to Editor
 - Engagement
 - Wedding
 - Anniversary
 - Birth Notice
 - Funeral
Service

**Links**

Southern Union
SIFAT
United Way
Randolph
Medical Center

**RTC** Roanoke Telephone Company

Ask about our *HomeAdvantage* packages
www.RoanokeTel.net
(334) 863-2111

## News

### Jail is commissioners' worst headache

*by Penny L. Pool*
*Wednesday, May 9, 2007 9:23 AM CDT*

Inmates sleeping on the floor; constant plumbing bills and the looming threat of federal intervention make Randolph County Jail perhaps the County Commission's biggest problem.

While the public may not care about the overcrowding at the county jail, county commissioners know they have to do something before a vastly more expensive answer is forced upon them.

The only answer they can see is taking a portion of the one-cent sales tax they dedicated to the city and county school systems, but that answer is down the road.



*A Randolph County Jail inmate naps on the floor between a bunk and the toilet in his tiny shared cell. /Matt Shelley*

State Rep. Richard Laird will introduce the legislation, which the public will vote on, but due to time constraints that will likely happen next spring. Gov. Bob Riley did not want any other initiatives on the June ballot or it could go on that.

This not a new tax, but if approved by largely anti-tax voters the schools will get 50 percent; the county commission will get 40 percent to build, operate and maintain the jail and 10 percent will fund volunteer fire department improvements in hopes of reducing the insurance costs homeowners pay.

The commission originally instituted the tax for the schools, which they legally can do, but voters must approve any other use of the money. Laird is requiring public hearings be held, which commissioners will schedule closer to the vote, but Lathonia Wright said he may go ahead and hold some informational hearings in his district.

Wright, a 17-year commissioner, said he has indirectly heard that people think the tax is a new one and it is being taken from education.

"We're not taking from education," he said, but sales tax is the only tax the legislation empowers commissions to levy for education. They cannot increase property tax. When the school boards asked for the tax four or five years ago it was for capital



Parkway
Parkway
800-4
Click
www.parkwa



Ken S
334-86
Click h
more inf



HUNTE

WED
256-35
1-888-4
Click for in
www.hkew



**Top Ads**

More T



Roanoke City
Schools
Randolph County
Schools
Chamber of
Commerce
City of Roanoke
Rep. Richard
Laird
Local History
Sex Offenders

**Search the Web**

[_____] [Find]
Web Directory
Yellow Pages
White Pages
Meet Someone
My Page
City Guide
Lottery Results
Weather
Movie Listings
Maps/Directions
Horoscope
Greeting Cards

**Online Poll**

**Stocks**

**Market Watch**



NASDAQ    May-31-2007
2608          2:59 pm ET

2594

2580
        9am 1am1pm3pm6pm

| Index | Last Trade | Change |
|---|---|---|
| NASDAQ | 2603.21 | 10.62 ▲ |
| SP 500 | 1532.26 | 2.02 ▲ |
| Russ 2000 | 848.22 | 2.87 ▲ |
| AMEX | 2350.10 | 8.34 ▲ |
| NYSE | 9985.76 | 22.15 ▲ |
| 30 YR BOND | 50.12 | 0.02 ▲ |

May 31, 2007 3:27 PM ET
ComStock 20 min. delayed

**Stockgroup**

improvements, but the commission did allow them to use it for some materials.

This tax that the commissioners must vote to renew annually would become permanent under the new legislation so the schools could hire personnel and plan budgets knowing that 50 percent of what they have been receiving would be there every year, Wright said.

In a recent tour of the jail by Sheriff's Capt. Craig Davidson and former commission chairman Kevin Spears they pointed out the jail was outdated when it was completed in 1985. Parts were not available then for many repairs and have to be created.

Spears said from October of last year until recently the commission had spent $30,000 on plumbing problems alone.

Every two to three weeks the plumbing has to be repaired and plumbers are not cheap, Spears said. One plumber who was badly shocked while working on the plumbing refuses to work on that area, he said.

"The plumbing's a nightmare," Spears said.

The old-style jail with easily accessible plumbing creates problems. Some jails Davidson said he has seen have the plumbing outside of the jail area where inmates do not have to be locked down while plumbers work, he said, and inmates cannot damage it.

At one time 18 of the 24 toilets had to be fixed at $500 a toilet, including labor and materials, Spears said.

Davidson tries to troubleshoot and repair what he can, he said. But every time they have to replace a flush valve it costs $200. When they shut off the water to make repairs the sediment moves through the line and flush valves have to be replaced.

At one time water from the floor above was running down the stove hood and into the food, although Davidson said it was clean water, not from showers. That problem has been fixed.

When a new jail is built, not if the jail is built, Spears said: "We're going to hire our own engineer to answer to us."

On the day the jail was toured 71 inmates occupied the spaces built for 36 but a few days earlier Sheriff Jeff Fuller said 82 were in the jail.

"We've always been over capacity and we have had 110 when there are only 36 bunks or beds," Fuller said.

"I've been wanting a new jail for 13 years. The day I took office we were overcrowded. The day I took office it was an old jail and the older it gets the more maintenance it takes. It's well past its 20-year life expectancy and that is if it is well maintained. We do the best we can," Fuller said.

His concern, Davidson's concern, Spears' concern and Commissioner Lathonia Wright's concern is also for the jail employees who spend more time in the jail than the inmates.

An inmate may spend a year there; most are transferred to the Department of Corrections, but staff spends year after year in the close quarters.

This has become a great concern since potentially deadly staph infections have occurred in the population, resulting in some hospitalizations.

It is unknown if these infections have been of the life-threatening, antibiotic-resistant strains but other diseases potentially dangerous to staff are Hepatitis B & C, HIV-AIDS. Of course in such close quarters flu and colds travel through the population.

"I've spent a great deal of money on special chemicals since these new diseases have

come in but you have that close contact because of the overcrowding and no quarantine," the sheriff said.

Employees are trained in dealing with this and most are state certified now, he said, and the more trained and state certified employees you have "the better the facility runs no matter what shape it's in," he said.

Regularly scheduled cleanings and special disinfectants are helping, he said. The showers in particular are dismal -- facilities most people would not want to use.

However, Davidson said there is plenty of hot water, despite the large population. It doesn't run out but when work is done on the plumbing the water has to be shut off, which creates obvious problems with flushing toilets.

Davidson stressed that the only way the current system works is because almost all the prisoners are cooperative and they all work together.

Entering the jail, various items are seen that catch water when it rains. Holes are cut to access the ancient wiring and plumbing systems.

To prevent escape, windows are covered with metal that blocks outside views and light.

In a good week inmates are taken once to a fenced exercise yard outside the kitchen. Inmates are allowed one 30-minute visit weekly in a no-contact visiting area, Davidson said.

Ideally, someone charged with murder would not be beside a bad check writer but in such crowded conditions segregation is almost impossible. However, other accommodations are found for someone with a history of violence, the sheriff said.

"I don't fear federal control but I know it will be considerably more expensive on the county if we wait till a federal judge takes control. Then we'll have no control over how it is designed if that happens," Fuller said.

"As it stands if we build the jail we will build it to where it meets the standard requirements, which are considerably less than if a federal judge forces us to build a jail," he said.

He has seen situations where jails cost more but were poorly designed for operation.

Fuller believes in building for the future and he is looking at 200 beds, with a potential of adding 200 beds in the future, Fuller said.

The county needs to build at today's cheaper prices for the future, he said.

During the jail tour more inmates are on the floors than on beds. Packed into the small spaces, inmates group around the television sets. Most barred areas have metal tables they gather around. In a spoke around the room are small rooms with bunks or mattresses on the floor where some inmates are sleeping or seeking some solitude.

One inmate, who came in under the influence of drugs, is in the detox cell.

Davidson points to a hole in the ceiling and to mold on the walls where inmates valuables are held. He said if someone comes in with valuable belongings, like a laptop, he has to secure it in his own locker to ensure its return to the owner when he leaves.

"Everybody here is not your hardcore criminal," Spears said, "some just made mistakes."

He points to doors that had to be welded shut because the inmates would get into the plumbing and damage it.

The whole jail is scheduled to be painted, he said. Most of it is air-conditioned, although

one area was hot enough to provoke some tempers.

"We've been able to avoid major riots," Davidson said. He points to one cell where the cameras cannot see. It is a dangerous blind spot, he said.

There was a major riot in 1993 and a less serious one in 1999. In this situation it takes everybody working together, a little give and take and the inmates themselves try to police and prevent problems, Davidson said.

Seventeen inmates were in one area where there were six beds. In another there were 18 inmates and six beds.

"Because we don't have adequate space we have someone not paying child support sleeping next to a murderer," Davidson said.

He was quick to point out the inmates pay for cable in the revenues generated from the commissary, not the taxpayers.

Television is a big factor in keeping things under control. It can be taken away as punishment, leaving the inmates with little to do, or continued as a reward.

The staph problem is almost under control, he said. Nurse practioner Ricky Daniels does a good job of providing medical treatment for inmates, he added.

"If not for the good quality of the staff and jailers it would be a lot worse situation," Spears said.

Editor's note: This is the first in a series of articles on the county jail.

🖶 *printable version*  ✉ *e-mail this story*

**Copyright © 2007 The Randolph Leader**
**Address:** PO Box 1267 Roanoke, Alabama 36274 • **Phone:** 334-863-2819

Home | News | Sports | Obituaries
Opinion | Calendar | Classifieds | Public Notices | Special Sections
Subscribe | About Us | Archives | Advertising | Guestbook

# EXHIBIT O

## *THE PEOPLE'S VOICE*

**06/29/2007**

# Letter Writer Pleads For Help, Shares Graphic Details of Confinement

The Peoples Voice African American Weekly News, Friday, June 29, 2007

*Editor's Note: The People's Voice received a lengthy letter to The Editors from an inmate currently incarcerated in Randolph County's jail. The length of the letter makes it impractical to publish in its entirety. However, we are including an abridged version of the correspondence.*

**Dear Editors Of The Peoples Voice:**

My name is Jeffery L. Fanning. I grew up in the West Point Lanett area as a youngster, but now I am residing in Atlanta.

The reason for me writing you all are concerning the conditions and policies of the Randolph County Court System and the Randolph County Jail and the powers that be.

Last year, I was coming from American, Alabama, heading to LaGrange. On Highway 431, there was a roadblock by the Randolph County Sheriff's Department. As I approached the roadblock, I noticed they waved through by the deputies. Upon seeing me, a young black man, riding in a nice appearing vehicle at night, they immediately told me to pull into the other lane so they could check my license and insurance, so I did as they said.

Upon showing them my license and insurance they asked me to pull off to the side of the road so I complied with their orders. While sitting on the side of the road, I was asked that I they did not catch up to me, and they might be a danger to the deputy himself or the other officers, and I replied, No I don't.

After they asked, I was minded stepping out of the car, and I said, Yes, sir, I do. He gave me strength to walk at least 3/4 miles through thick brush and infested creeks and streams.

I finally made it to Roanoke, where I could try to get someone to help me because I was exhausted by this time. I knew it was not over yet, though because they will my license cause they found a small amount of marijuana residue in it. They also instructed to pour bleach on my cousin that I was scared of them being done, right there, I was guilty of attempting to elude, so I immediately dammed on the brakes I would go over again. While I was coming down, I wrecked my vehicle, which was racing and I was scared. My heart was not the case. My heart was racing and I was scared...

It took me all night long and it took me until day light to make it to Roanoke. I got to see first hand what a runaway slave felt like with a pack of angry slave drivers hot on his trail. I prayed.

After all was said and done, I was charged with:

1. Wreckless driving
2. Attempting to elude
3. Paraphernalia, and
4. Possession of marijuana.

Inside the Randolph County Jail, I am made to sleep on the broken toilets that have drinking water, which is a bio-hazard like the feces and urine that lay stagnant in the toilets. We are exposed to mold on a daily basis, because the cells we are in have broken toilets with feces inside them that have been standing in the bowls for months. The inmates are instructed to pour bleach on their and to wrap the feces to mute the mold. The blankets they give us have so many holes in them they look more like nets than blankets. It is impossible to cover the cold because of all the black all the cold block is supposed to be peace roll over and alternate sides be—

There are feces and urine in our ice cubes that we are drinking water, which is a bio-hazard like the feces and urine that lay stagnant in the bowls of the toilets...

*Note: In this part of the letter, the inmate described in graphic detail, the court proceedings that resulted in his being jailed. He indicated that his attorney had filed a lawsuit on his behalf, that he desired a matter of fact, there existed an issue in here, but few inmates ever report what is going on for fear they will be locked down in isolation for weeks on end.*

Inmates are denied proper medical care. The doctor only comes once a month. When inmates ask to see a dentist, they are denied because they never have enough. Inmates need dental care to call a dentist to the jail or to take the inmate to the dentist.

There are roaches frozen in our ice cubes that we are drinking water...

Even if you cannot help us or do not want to have anything to do with this, please respond to me in a letter so I will know you got this letter because I have asked places where it is to be sent, which is a violation of rights, too.

*Note: The inmate concluded his letter by requesting help from individuals to assist him. He stated his belief that there were not getting circumstances that would justify release. In addition to this, I am notifying all news stations and paper of what is happening in this jail all about how I am treated along with the other inmates. Others white inmate was beaten by another for almost 15 mi—*

**Sincerely Yours,**
**Jeffery Fanning**